390 P.2d 55

Mildred V. DUEROCK, Claimant-Appellant,

v.

Floyd ACARREGUI, dba Main Motel, Employer, and Hartford Accident & Indemnity Company, Surety, Defendants-Respondents.

No. 9350.

Supreme Court of Idaho.

March 3, 1964.

Rehearing Denied March 25, 1964.

Givens, O'Leary, Doane & Givens, Boise, for appellant.

**26**

Elam, Burke, Jeppesen and Evans, Boise, for respondents.

TAYLOR, Justice.

In May, 1960, claimant (appellant) Mildred Duerock was employed by defendant (respondent) Floyd Acarregui, as manager of the Main Motel, in Boise. Hort Duerock and claimant had been husband and wife since November, 1921.

At the hearing before the board, except for the testimony of two doctors as to her injuries, claimant was the only witness, and—although both parties had available testimony to corroborate her testimony—it was stipulated that claimant's testimony together with certain documentary exhibits, "shall constitute the facts of the case to be submitted to the board." So far as pertinent to the issue presented by this appeal, the facts were correctly summarized by the board as follows:

"Mrs. Duerock as manager of the motel was required according to her testimony to be available for duty 24 hours a day. Under the arrangement made with her employer in May, 1960, she and her husband were allowed living quarters, an unfurnished five-room apartment back of and adjoining the motel office. The employer also assumed the cost of utility services for the apartment. To enter the apart-

ment from the front it was necessary to go through the motel office, where a telephone switchboard was located. The door bell at the entrance to the motel office was fixed to ring in the manager's apartment. The apartment consisted of a living room, two bedrooms, a kitchen, with dinette, a bathroom and storage space.

"It was a part of the arrangement with the employer that the manager's husband, Hort Duerock, in his spare time would assist here as a handyman and repairman.

"In money the couple received $250 per month by check made payable to Mrs. Duerock. At the end of every two-week period the couple were relieved from duty for two days by Acarregui and his wife, who would come over from their home in Jordan Valley [Oregon].

"When the Duerocks were first employed, Hort Duerock had a regular job elsewhere as a mechanic. He was laid off from that job in October of 1960 by reason of his inability to work regular hours, primarily due to his alcoholism. During the period from October, 1960 until January 20, 1962, his only employment was sporadic aid in and around the motel premises as a handy man.

* * * * * *

"For about 20 years prior to January 20, 1962, Hort Duerock had been drinking alcoholic beverages in increasing quantities, and as a result was finding it increasingly difficult to hold a job as a mechanic, a trade in which he excelled during the early years of their marriage. For a long time prior to January 20, 1962, claimant and her husband had had many serious quarrels. Although they had their 'good moments,' in general during the period of several years prior to Hort Duerock's death, their domestic life was filled with strife and discord.

"On three specific occasions in the last few years, Duerock had threatened to take his wife's life with a gun. One such occasion was in California in 1955. Another in November of 1961, on which occasions Mrs. Duerock called the police.

"Claimant filed suit for divorce from her husband on July 6, 1961, alleging extreme cruelty on his part. Within five or six weeks, however, in response to his entreaties and promises to amend his way, claimant resumed living with him in an attempt to save their marriage. The attempt was apparently futile and it appears if anything conditions worsened.

"The Duerocks brought with them to their employment at defendant-employer's motel their marital difficulties of long-standing. Their problems were soon aggravated by the husband's loss of his regular job as a mechanic. It appears that claimant's husband resented the fact that his wife had become the primary breadwinner of the family and he the dependent. He had little to occupy his time except drinking. On several occasions Hort Duerock took money from the business till for liquor, which funds claimant replaced. On several occasions claimant remonstrated with her husband about coming into the motel office in a drunken condition when patrons were present. Hort Duerock often expressed dissatisfaction with the motel employment and suggested or demanded that they leave and find other employment and reside elsewhere; claimant replied that until he could rehabilitate himself and earn their living she would have to remain, as they did not have any independent means. Her husband in particular objected to the annoyance of patrons ringing the doorbell and buzzing the telephone switchboard.

"There had been a heavy snowfall on January 30, 1962. Mrs. Duerock employed a man to shovel snow around the motel. Her husband assisted him. The job was finished about 3:30 p. m. In the late afternoon Duerock, who had been drinking all day, came into the motel office in an intoxicated condition. After the patrons present had left, claimant asked him to leave and not to come in there again in such condition. He went into their living room. Claimant went into their kitchen to prepare supper. Duerock followed her and again complained of the 'bells and things' ringing and demanded that she quit. Claimant responded to the effect that until he found a job she could not quit hers, and that she did not want to discuss it any more. Whereupon he slapped her face. She said: 'Don't you ever strike me again.' He said something to the effect that: 'Well, I know how to end this thing and it won't take two minutes.' These were the last words spoken between them.

"Duerock left the room. Mrs. Duerock continued with the preparation of their meal, placed it on the table and called him to eat. She filled her plate and carried it into the living room, set it on the coffee table and then was interrupted by a switchboard call. Then claimant returned to the living room to resume her meal while watching television. Her husband was eating his meal in the dinette. He got up, went into the bedroom and return-

ed and stood beside and behind her and shot her with a .32 calibre revolver, the bullet causing a deep two-inch gash in the upper portion of her head. The wound paralyzed her and she did not hear the shot, but observed him leaving the room, reentering the dinette-kitchen with the gun in his hand. Unknown to her at that time, he then shot himself in the right temple with fatal effect."

On these facts the board ruled:

"The attempted assassination of his wife by Hort Duerock was pre-meditated. He harbored his evil intent years before the beginning of their employment by the defendant employer herein. His act was not that of a co-employee but of a selfish, bestial husband. His assault grew out of long years of marital infelicity.

"The injury which her husband inflicted upon claimant was not the result of an accident arising out of and in the course of her employment with Acarregui. It did not occur on the employer's business premises but, in the private residential abode of the husband and wife. It was their home * *.

"It occurred during their dinner hour when neither was performing any active service for the employer. It is true that Mrs. Duerock was on standby service to answer the telephone in the adjoining office and to answer a call bell at the outer entry to the motel office, and that shortly before the assault she had performed such services. But she had returned from that mission and was sitting in a chair in her living room, eating her dinner from a plate in her lap, while watching television, when her husband without warning with felonious intent shot her. Her injury was not the result of an industrial but of a domestic hazard."

Claimant brought this appeal from the order of the board denying compensation.

■ Whether claimant's injury arose out of her employment is the sole issue presented. Although at the moment the accident occurred claimant was not actively engaged in the service of her employer, she was on duty subject to immediate call to that service. Therefore the accident occurred in the course of her employment. Stewart v. St. Joseph Lead Co., 49 Idaho 171, 286 P. 927; 1 Larson's Workmen's Compensation Law, § 24.00. Cf. Colson v. Steele, 73 Idaho 348, 252 P.2d 1049.

In order to determine whether the injury arose out of the employment it was necessary for the board to receive and consider evidence of the past domestic difficulties between claimant and her husband and other facts leading up to, and resulting in, the shooting.

Portions of claimant's testimony which substantially support the conclusion of the board as to the cause of the assault are as follows:

On direct examination:

"Q I will ask you this, Mrs. Duerock, did at any time your husband, Hort, indicate to you his particular attitude or state of mind regarding your working at the motel, or his working at the motel?

"A Well he wanted me to take that job.

"Q I beg your pardon?

"A He wanted me to take that job.

"Q That was in—?

"A In 1960, and as I was staying home and I wanted to work, I thought it would be good for me to get out and work and I went down to Mr. Acarregui and applied for the job—and I got it, and up until October 1960 he was perfectly willing and he liked the job, and when he couldn't work at his occupation any longer he became dissatisfied with the motel work and he began to drink more and more and when he was there he was very dissatisfied. * * *

"A I said when he could take me and make a living for me, I would quit, but I asked him what we would live on.

He had no job and no money and he was sick all the time, and I asked what we would live on and he said he would find work, but he was in no condition to work. He was sick all the time and—"

On cross-examination:

"Q When did you and your husband first begin to have difficulty, Mrs. Duerock, with the marriage and with his drinking problem?

"A About twenty years ago he started in to drink more and more.

"Q I know he had had some trouble, apparently, from time to time and was picked up for drunk driving, wasn't he?

"A Yes.

"Q And I think he was arrested once in California, wasn't he, in 1954?

"A Yes.

"Q I suppose during these years he had trouble holding a job because of the drinking, didn't he?

"A He was—they often warned him about drinking but he used to never go to work drinking, but then later years, he got so he would go to work and be drinking—and he was good at his job. He was rated as top mechanic in the northwest. He was an exceptional man in his field.

"Q I suppose then with the drinking that you probably had a good many

words back and forth during these years, particularly.

"A Yes, I am sorry to say, there were.

"Q It became quite a personal problem between you, as I understand it, didn't it?

"A Yes. * * *

"Q I suspect he felt rather badly about being laid off and being unemployed—I imagine this bothered him a good deal, didn't it?

"A Yes, it did.

"Q I think you testified that even after that his drinking kept up?

"A Yes.

"Q He had been carrying a 32-revolver for some time, hadn't he?

"A I think so. I couldn't say for sure because I didn't know when he first started carrying it.

"Q Do you know where he kept it in the motel?

"A Under his pillow, or under the mattress.

"Q How long had it been there?

"A I can't rightly say because he sold the—he took one gun and sold it and then I didn't think he had another gun.

"Q When did he sell the first gun, do you remember? Approximately, not the exact date, of course.

"A I think it was in the summer some time.

"Q That would be in the summer preceding, in 1961?

"A In 1961.

"Q You weren't sure, you say, whether he had another gun?

"A I didn't know about that, when he got it but he picked up another gun some place.

"Q Didn't he actually threaten you with this gun in November of 1961?

"A He did.

"Q And you called the police, didn't you?

"A Yes.

"Q And, of course, I suspect that was after a—sort of words between you, was it?

"A Because I wouldn't quit my job.

"Q Had he threatened you before with the gun, Mrs. Duerock?

"A One time in California.

"Q How long ago was that?

"A In 1955, I think.

"Q So he had been carrying a gun for a number of years—at least he has had access to one, is that correct?

"A Yes, he has had a gun more or less all the time we have been married, but he has never threatened me with it until the last few years, and—

"Q I imagine because of these threats and the other difficulties you have had, his desire for drink, I suspect that was one of the reasons that led you to file the divorce complaint against him?

"A Yes.

"Q In—

"A In July of 1961.

"Q I take it, it was just getting rather difficult to live with him, wasn't it?

"A Yes.

"Q I suppose it was just one battle after another over these things, wasn't it?

"A We had our good moments. * * *

"Q In the complaint you make general charges of mental cruelty, is that correct?

"A Yes.

"Q Were these charges the facts that you have been mentioning here?

"A Yes.

"Q The divorce was never granted was it—you never went to court on it?

"A I never went to court on it, because I got to feeling sorry for him, and he promised to turn over—to quit drinking—and he seemed so sincere. You just don't toss off forty years.

"Q I can understand that, Mrs. Duerock. You were making every effort to save this marriage.

"A Yes."

■ The burden of proving that the injury arose out of and in the course of the employment is on the claimant. I.C. § 72–604, footnote, Burden of Proof; Davenport v. Big Tom Breeder Farms, Inc., 85 Idaho 604, 382 P.2d 762; Kiger v. Idaho Corp., 85 Idaho 424, 380 P.2d 208; In re Brown's Death, 84 Idaho 432, 373 P.2d 332; Flasche v. Bunker Hill Co., 83 Idaho 420, 363 P.2d 1024.

■ "On appeal from orders of the industrial accident board the court [Supreme] shall be limited to a review of questions of law." Const. art. 5, § 9. Determination of the facts is exclusively within the power of the board. Where its findings are supported by substantial and competent evidence, this court has no authority to modify, or set them aside, nor to make findings based upon its view of the evidence. In reviewing the evidence this court's prerogative is limited to a determination as to whether the board's findings are thus supported by the evidence as a matter of law.

Const. art. 5, § 9, footnotes, Workmen's Compensation decisions.

"We have repeatedly read and considered this record and although the evidence is far from satisfactory to the effect that the accident and resultant injuries arose out of and in course of respondent's employment, we are nevertheless unable to say that, *there is no substantial evidence to support the Board's finding.* Sec. 9, Art. 5, Const., see 1937 Sess. Laws, page 498.

"The order of the Board will therefore be, and is hereby, affirmed. * * *" Potter v. Realty Trust Co., 60 Idaho 281, 90 P.2d 699.

In borderline cases "To the Board it may seem reasonably clear that it falls on the one side, while to counsel or the appellate court it may seem to fall on the other. In such case, however, the constitution admonishes us that 'On appeal from orders of the Industrial Accident Board the court shall be limited to a review of questions of law.' * * * We think the evidence supports the findings of the Board and its order should be affirmed, and it is so ordered." Skeen v. Sunshine Mining Co., 60 Idaho 741, at 747–748, 96 P. 2d 497, at 499.

"Where, then, as in the instant case, the facts and circumstances disclosed by the record 'are such as might very well lead different minds to reaching different conclusions upon the issue presented; and where such is the case, however meager the evidence, if it is of a substantial nature and character, the findings of the triers of fact should prevail.'" Cameron v. Bradley Mining Co., 66 Idaho 409, at 415, 160 P.2d 461, 463.

In the process of determining the ultimate facts in issue, the drawing of reasonable conclusions and inferences from the evidentiary facts is also within the prerogative of the fact finding authority. 88 C.J.S. Trial, § 211; 53 Am.Jur., Trial, §§ 158, 159.

"The determination of the question of whether Graf's injuries arose out of his employment involved the weighing of evidence, a consideration of the probabilities, and the giving of credit to testimony. The established rule is that it is the province of the commission, qualified by experience and special study, to draw reasonable conclusions and inferences from evidentiary facts in workmen's compensation proceedings, and the courts are not privileged to substitute their judgment for factual findings of the commission unless they are clearly and manifestly contrary to the weight of the evidence." Jefferson Ice Co. v. Industrial Commission, 404 Ill. 290, 88 N.E.2d 837.

"The credit and weight to be given testimony in a workmen's compensation proceeding is for the Industrial Accident Board. Benson v. Jarvis, 64 Idaho 107, 127 P.2d 784; Walker v. Hogue, 67 Idaho 484, 185 P.2d 708; Miller v. State, 69 Idaho 122, 203 P.2d 1007; Davis v. Sunshine Mining Co., * * * [73 Idaho 94, 245 P.2d 822]; Dawson v. Potlatch Forests, Inc., 82 Idaho 406, 353 P.2d 765." Flasche v. Bunker Hill Company, 83 Idaho 420, 426, 363 P.2d 1024, 1028.

In Walker v. Hogue, 67 Idaho 484, 491, 185 P.2d 708, 711, this court said:

"It is only for us to determine whether there was any substantial, competent evidence before the Board which supported its conclusions of fact, * *."

The issue in this case having been submitted upon the testimony of claimant, the board observed that "The issue therefore is one of law to be determined on what amounts to an agreed statement of facts." This is a simplism. In order to reach a conclusion as to whether the shooting arose out of claimant's employment it was necessary that the board draw certain evidentiary conclusions and inferences from her testimony. Thus, it was necessary for the board to determine whether Hort Duerock's ill will toward claimant arose out of longstanding marital difficulties; out of his brooding over the fact that he had become unable to continue in gainful employment, and thus dependent upon claimant; or whether out of his dislike of the motel employment and her refusal to quit, or her remonstrating against his taking money from the till, and appearing before patrons in a drunken condition. This was a part of the board's fact-finding function, and its determination of these questions is binding upon this court.

The general rules governing the determination of compensability in cases such as this were stated in Hudson v. Roberts, 75 Idaho 224, at 229–230, 270 P.2d 837, 839–840, as follows:

"It may be stated as a general rule that where an employee is assaulted and injury is inflicted upon him through animosity and ill will arising from some cause wholly disconnected with the employer's business or the employment, the employee cannot recover compensation simply because he is assaulted when he is in the discharge of his duties. Under such circumstances the injury does not arise out of the course of employment, and the employment is not the cause of the injury although it may be the occasion of the wilful act, and may furnish the opportunity for its execution. (Citations).

* * * * * *

"When a wilful injury is inflicted upon a workman while performing the tasks he is hired to perform, and such assault is not motivated by personal animosity, unconnected with the employment, directed against the one on whom the injury is inflicted, such wilful and criminal assault by such third person is generally to be regarded as accidental and as having arisen out of and in the course of employment. Especially is this true where the nature of the employment is such as naturally to invite an assault or when the employee is exposed to an assault by the character of his work; or when he is protecting or in charge of his employer's property. Injuries arising from such an assault are generally considered a hazard or special risk of the employment and compensable."

In that case we also quoted with approval the rule as summarized by the annotator in 112 A.L.R. at 1262, as follows:

"Where there is some causal connection between the employment and the assault, or where the conditions of the employment have the effect of exposing the employee to an assault, it is generally held, in the absence of extenuating factors, that the injury is compensable."

In the Hudson case the employee, a bartender, was shot by a third party while he was on duty behind the bar and attempting to keep order and protect his employer's patrons and property. The board found that the assault was connected with the claimant's employment, negativing the contention that it arose out of personal ill will of the assailant toward claimant. The board's finding was affirmed.

In Louie v. Bamboo Gardens, 67 Idaho 469, 185 P.2d 712, the injured employee, a dishwasher, was shot, by an insane man, while on duty in the restaurant where he was employed. There had been no previous contact between the assailant and his victim. Hence, the finding that the assault was not motivated by any personal ill will or animosity, but resulted from the fact that claimant was in the cafe at the time the assailant chose there to seek and destroy his imagined persecutors, required a ruling that the injury was connected with the employment.

In Brink v. H. Earl Clack Co., 60 Idaho 730, 96 P.2d 500, claimant's decedent sustained a head injury when the truck, which he was driving in the course of his employment, overturned. The next day he shot and killed himself with a rifle. The board found that the shooting was accidental and was not caused by intoxication and that the deceased did not commit suicide. This court held that such findings required a con-

clusion that the shooting resulted from the deceased's "apparent and continuing altered mental condition" caused by the head injury and thus arose out of his employment.

In Colson v. Steele, 73 Idaho 348, 252 P.2d 1049, claimant was injured by the accidental discharge of a pistol dropped by a fellow employee at the conclusion of target practice engaged in by members of a surveying crew during their noon luncheon period. After holding that the accident arose in the course of the employment, the question here involved and the governing rule was there stated as follows:

"The remaining question is, did the accident arise out of appellant's employment? In order for the accident to be held to have arisen out of employment, it is not necessary that it arise out of some act directly furthering the work of the employer. It is sufficient if the accident arises out of a risk incidental to the work as customarily conducted. (Citations.) * * *

"In this case, the carrying of the firearms and the indulgence in pistol practice both during the hours of employment and at the lunch hour was usual and customary. Such practice was known, condoned and participated in by the foreman. (Citation.) It had become a risk of the work as usually conducted." 73 Idaho at 352, 252 P.2d at 1051.

There was no evidence in this case that the employer knew of Hort Duerock's drinking habit or of the domestic friction existing between the husband and wife at the time he employed them, nor that he became aware of such while they were at the motel. The employer lived in Oregon and came to the motel to relieve claimant two days every two weeks. During these periods the Duerocks were off duty and the record shows no incidents occurring on such occasions, which might bring the troubles of the Duerocks to the attention of their employer. Hence, it cannot be said that the employer condoned Duerock's conduct or ill will to his wife, or made it a risk of her employment.

In Devlin v. Ennis, 77 Idaho 342, 292 P.2d 469, claimant's decedent was shot, by his employer, while he was at work. The board found that the shooting arose out of the personal ill will entertained by the assailant against his employee resulting from the latter's attentions to a widow with whom the employer had boarded, and of whom he had apparently become enamoured. In that case this court quoted with approval from Larson's Workmen's Compensation Law, vol. 1, § 11.21, as follows:

"When the animosity or dispute which culminates in an assault is imported into the employment from claimant's domestic or private life, the assault does not arise out of the employment under any test. Even the broadest

of all, the but-for or positional test, rules out compensability on the reasoning that the assault would have been made in any case, since the assailant was evidently determined to have his vengeance wherever he might find his victim."

In the Devlin case the board denied an application by claimant for a hearing and determination of the sanity of the assailant. The dissenting opinion, in which this writer joined, urged that the denial of such a hearing was error.

 In this case no issue was raised as to the sanity of Hort Duerock. The finding of the board that his shooting of claimant was premeditated is supported by the evidence. The altercation between the two, concerning his appearance in the front office in a drunken condition, occurred while she was preparing the evening meal. After it occurred, and during which time no further words passed between them, claimant finished preparing the meal and served it, Hort ate his meal, she had answered the telephone and door bells, had returned to the living room and was eating her meal, when Hort went into the bedroom, procured his gun, returned and shot her. The shooting did not arise out of a sudden heat of passion engendered in the quarrel over her refusal to quit her employment. See Larson's Workmen's Compensation Law, vol. 1, § 11.13. This, together with the long history of friction between the couple occasioned by his alcoholism, supports the finding of the board that the "assault grew out of long years of marital infelicity" and that injury was not the result of an accident arising out of her employment.

The risk existed before her employment. It was a personal risk she brought with her, a part of her domestic and private life. It was not a risk occasioned by, incident to, or a condition of, her employment. The following authorities support this conclusion: Brantley v. State Ind. Comm. (Okl.) 315 P.2d 779; Pacific Employers Ins. Co. v. Industrial Acc. Comm., 139 Cal.App.2d 260, 293 P.2d 502; Stark v. Wilson, 114 Kan. 459, 219 P. 507, 509; DeClemente v. New York State Rys., 246 App.Div. 649, 283 N.Y.S. 199; Willis v. Taylor & Fenn Co., 137 Conn. 626, 79 A.2d 821; Lanier v. Brown Bros., 44 Ga.App. 831, 163 S.E. 263; Harden v. Thomasville Furniture Co., 199 N.C. 733, 155 S.E. 728; Phelps v. United Carbon Co., 8 La.App. 128; 99 C.J.S. Workmen's Compensation §§ 226, 227; 58 Am. Jur., Workmen's Compensation, §§ 265, 266. See also Annotations: 15 A.L.R. 588; 21 A.L.R. 758; 29 A.L.R. 437; 40 A.L.R. 1122; 72 A.L.R. 110; 112 A.L.R. 1258.

The order of the board is affirmed.

No costs allowed.

KNUDSON, C. J., and McQUADE, McFADDEN and SMITH, JJ., concur.