442 P.2d 448

Neva DAVIS, widow of Elmer Davis, Deceased, Claimant-Appellant,

v.

SCHMIDT BROTHERS, INC., and Workmen's Compensation Exchange, Defendants-Respondents.

No. 10063.

Supreme Court of Idaho.

June 18, 1968.

Paul C. Keeton, Lewiston, for claimant-appellant.

Blake, Givens & Feeney, Lewiston, for defendants-respondents.

McFADDEN, Justice.

Neva Davis, appellant herein, is the surviving widow of Elmer Davis, deceased. Respondent Schmidt Brothers, Inc., the employer of Elmer Davis, operates a lumber mill at Weippe, Idaho. Respondent Workmen's Compensation Exchange is the surety for the employer.

Davis died on July 12, 1965, while working as the superintendent of the employer's lumber mill. Subsequently his widow filed with the Board a claim for benefits as a widow under the workmen's compensation act. She petitioned for hearing, alleging that her husband suffered personal injury caused by an accident arising out of and in the course of his employment with Schmidt Brothers, Inc., and that his death resulted therefrom. The respondents by their answer denied these allegations, and as an affirmative defense alleged that Davis' death resulted from a pre-existing condition of the heart which in no way arose out of or in the course of his employment. Hearing was held by the Board on the issues presented by the petition and answer. The Board subsequently entered its order denying appellant's petition for benefits, from which she has appealed.

Appellant claims that the Board erred in certain of its findings and in its order denying her claim. She also assigns as error the refusal of the Board to admit into evidence two written statements signed by two of her witnesses.

After reviewing the testimony elicited from the witnesses on behalf of appellant and respondents, the Board in its ultimate findings and rulings of law held:

"While the death of Elmer Davis on July 12, 1965, occurred in the course of his employment by Schmidt Brothers, Inc., his widow, Neva Davis by a preponderance of the evidence failed to prove—

(a) With medical certainty or with any degree of medical probability the cause of Elmer Davis' death. The cause of death is unknown and in the absence of a timely autopsy is not now ascertainable.

(b) That immediately preceding his death Elmer Davis suffered an accident arising out of his employment.

(c) That with medical certainty or with any degree of medical probability decedent's anger exhibited at another situs approximately half an hour before his death precipitated his death.

(d) That with medical certainty or with any degree of medical probability he had at the time of his death a pre-existing coronary disease."

Pursuant to the foregoing, the Board entered its order denying appellant's claim.

At the hearing the following facts were established. Davis, a large robust man, was the superintendent of the Schmidt Brothers lumber mill, which employed about 17 persons. Davis enjoyed fairly good health all of his life. However, in July and August of 1955, he suffered chest pains and conferred with Dr. Hopkins in Orofino, who referred Davis to an internist, Dr. Crismon, in Lewiston. Dr. Crismon conducted a physical examination and took an electrocardiogram. At that time Davis' blood pressure was somewhat above normal. The doctor reported that as concerns Davis' first examination:

"The only really positive findings here were the elevated blood pressure, which may have been part of the man's apprehension. I feel that the pain is certainly not a heart pain as he describes it unless it is related to the blood pressure. I would suggest that he be followed at home and

if this is a rising blood pressure, that definite steps for a more thorough investigation be taken. However, if this is the blood pressure that he has held for years or if it comes down when he is more settled, then no further action need be taken in this regard. If the pains by any chance get more severe, then chest flouroscopy, etc., under hospitalization could be done."

After leaving the doctor's office, he again suffered severe pain and was admitted to the hospital, where he was treated and observed. The doctor stated "I concluded—at the moment, therefore, I still don't know what this man has, but the pain does not seem to be heart per se." In September of 1957, a second electrocardiogram was taken and compared with the first. Relatively little change was noted. The doctor's opinion could best be summed up as being that he would not have classified Davis as a definite heart patient, but that Davis did not appear normal either—that the doctor suspected that Davis might have a heart condition.

On July 12, 1965, at the age of 60 years, Davis arose, had breakfast and reported for work between 6:30 and 7:00 a.m. Shortly after the mill started operations, Davis had an argument with a worker who did not wish to tend the position Davis assigned him. As a result, Davis discharged the employee. The severity of the argument and the effect it had upon Davis was variously described by the witnesses. Davis then went to a pick-up truck and drove towards the office, which was about a thousand feet from the mill. About 7:30 a.m. Davis was found in the company pick-up truck. A witness described him as being in a slumped position with his head down on his chest but not on the steering wheel; his lower face and neck was blue or ashen-colored, and his color looked bad. One witness testified "he was black—neck and lower jaw was a bad color. * * * His face was normal on the upper part. Just the blackness and darkness was all I noticed on the lower jaw and neck."

Mrs. Davis came to the office and she stated, "His color was bad; he was ashen. I tried to find a pulse in his arm. I couldn't find any. * * * I tried to find a pulse in the vein in his neck, and I couldn't find one there." Davis was taken to the hospital, and Dr. McCumber pronounced him dead on arrival at the hospital.

Dr. McCumber, one of appellant's witnesses, a physician practicing in Orofino was presented with a hypothetical question by appellant's counsel. This hypothetical question recited the facts then in the record. It also assumed that there was argument by the hypothetical man with a recalcitrant worker, and "that the hypothetical man was angry, talked in a loud voice, got red in the face and advised the recalcitrant worker that he was fired and would have to go to the office for his pay." The witness stated that he had an opinion as to whether there was a causal relationship between the facts outlined concerning the health of the person and the circumstances involved in the confrontation with the recalcitrant worker, and death. The doctor then stated:

"A. I feel there *could* be a causal relationship. In the hypothetical question, you state the man has evidence of coronary artery disease.

Q. Doctor, what is the reason for your opinion there could be a connection?

A. I base it mainly on experience I suppose. We see many times that people have a long history of heart disease and will have through coronary a fatal determination.

Q. Doctor is there, in your opinion, a connection between anger, emotional strain, excitement on the part of a person and death where coronary artery disease is involved?

A. Yes, it's *theoretically possible.*" (Emphasis added.)

Dr. Crismon, claimant's key witness, an internist practicing at Lewiston, was asked practically the same hypothetical question

as asked Dr. McCumber. After reciting the facts as presented by the record, the following assumption was interjected by the hypothetical question:

"(Assume) that the hypothetical man showed some excitement when he was advised of this situation and commented to one of the workers at the mill that he 'had a one-man strike going on and that he would end that one in a big hurry.' That immediately following this time he went to the greenchain where the recalcitrant worker was engaged in handling lumber and that an argument took place between the hypothetical man and the recalcitrant worker. That the hypothetical man was angry, talked in a loud voice, got red in the face and advised the recalcitrant worker that he was fired and would have to go to the office for his pay."

Dr. Crismon was then asked, assuming the facts to be true, if he had an opinion, based upon reasonable medical certainty and from a medical and surgical standpoint, as to whether there might or could be a causal connection between the circumstances and events described to him and the death of the hypothetical man. The witness replied that he had such an opinion and when asked as to what this opinion was, replied:

"I have an opinion, but it is not based upon reasonable medical certainty."

The questioning continued:

"Mr. Keeton: Doctor, do you have an opinion based upon a reasonable medical probability?

A. Oh, I might stretch it that far, yes.

Q. What is your opinion, Doctor, based upon a reasonable medical probability?

A. My opinion is there *could be* a causal connection." (Emphasis added.)

Upon request of the witness to elaborate on the reason for his answer, the following statements were made by Dr. Crismon:

"Earlier in my testimony I was making quite a point between the two kinds of coronary insufficiency—that caused by spasm and that caused by hardening. Theoretically, if you have enough hardening of the arteries, then spasm, which would be caused from emotion, would not be a factor. It would be one that could react to adrenalin.

"What I am really saying is this: Yes, there could be a relationship even if it were a healthy heart.

"I am not aware of any evidence that would say that it's (sic) more likely on a sick heart of this type, but I think it is, yes, but I am not aware of any evidence like this."

" * * *.

"Q. Doctor, based on a medical probability, * * * do you have an opinion whether or not this man's work resulted in a heart condition?

"A. Well, at the moment, I would probably have to answer probably not."

Doctor Chinchinian, a physician licensed to practice in Washington and Idaho, was called as a witness by the respondent. He discussed the facts as presented by the previous testimony and records of the deceased. In answer to a question as to whether or not Mr. Davis was suffering from a diseased heart, he stated in response to the following question:

"Q. Based upon this knowledge, can you state with reasonable medical probability whether or not this man had a diseased heart?

A. I could say only that he could have, but not with any certainty that he did have.

Q. (By board member) He asked you in the realm of probability.

A. The answer is yes."

He was then presented with a hypothetical question similar to the ones asked of the other medical experts. The questioning continued:

" * * *.

"Doctor, based upon these hypothetical facts, do you have an opinion based upon a reasonable medical certainty or a rea-

sonable probability as to the cause of death of this individual?

A. No.

\* \* \* \* \* \*

Q. Do you have an opinion as to whether or not there is a causal connection between the events and the circumstances around the firing of the employee and his subsequent death?

\* \* \* \* \* \*

A. My opinion is that the person could have died from several causes.

\* \* \* \* \* \*

Q. Doctor, for the sake of the hypothetical, adding one additional factor, that the circumstances surrounding the firing of the employee did create in the individual an emotion, do you have an opinion as to the causal relationship between the circumstances of the firing which includes an emotion experienced by the individual and the resulting death or subsequent death?

A. Not any more than I have just stated it.

Q. Can you say that there is a reasonable probability of causal connection between the circumstances surrounding death and death?

A. On the basis of the reports that I had read, no."

As previously pointed out, the Board in its ultimate findings, held that the claimant failed to prove by a preponderance of the evidence the medical certainty or probability of the cause of Mr. Davis' death; or that Mr. Davis suffered an accident arising out of his employment and further, that she failed to prove with medical certainty or with any degree of medical probability that decedent's anger precipitated his death or that with medical certainty or with any degree of medical probability that at the time of his death he was suffering from pre-existing coronary disease. On the basis of these ultimate findings, the Board denied benefits.

 The record fails to reflect that degree of proof necessary for a reversal of the Board's findings. The appellant had the burden of proving that Mr. Davis suffered a personal injury caused by an accident arising in the course of his employment which resulted in his death. Duerock v. Acarregui, 87 Idaho 24, 390 P.2d 55 (1964); In Re Brown's Death, 84 Idaho 432, 373 P.2d 332 (1962). Determination of the facts is exclusively within the power of the Industrial Accident Board; where findings of the Board are based on conflicting evidence, those findings are binding upon this court. Gregg v. Orr, 92 Idaho 30, 436 P.2d 245 (1967); Duerock v. Acarregui, supra; Comish v. J. R. Simplot Fertilizer Co., 86 Idaho 79, 383 P.2d 333 (1963).

The Board was not convinced that there was a causal connection between Mr. Davis' employment and his death; it being appellant's burden to establish this connection, which in a case of this nature is primarily dependent upon medical testimony, the decision of the Board must be upheld. The Board is the arbitrator of disputed and conflicting facts and opinions, and its determination when supported by substantial though conflicting evidence will not be disturbed on appeal. Bradshaw v. Bench Sewer Dist., 90 Idaho 557, 414 P.2d 661 (1966). It is our conclusion that the appellant here failed in her burden of proof and the Board's finding in this regard cannot be disturbed.

Appellant also asserts that the Board erred in rejecting two of her exhibits, and in refusing to allow her to impeach her own witnesses. During the course of the hearing, Mr. Erickson and also Mr. Meisner testified as witnesses on her behalf. Mr. Erickson was an employee of the Schmidt Brothers mill at the time of Mr. Davis' death. He testified as to the conversation that he had with Mr. Davis and described Mr. Davis' appearance at that time. Appellant then presented to the witness an exhibit which was a written statement previously made by the witness to an investigator. This exhibit was offered in evidence for the purpose of impeaching this witness, which offer was rejected by

the Board. Mr. Meisner was also an employee of the Schmidt Brothers mill on the morning of Mr. Davis' death. Mr. Meisner was the person with whom Dr. Davis had the argument and whom Davis fired. Mr. Meisner testified as to the conversation he had with Mr. Davis. He described Mr. Davis' appearance, his tone of voice, and their discussion. Appellant offered another exhibit into evidence which was also a written statement signed by Meisner and obtained by an investigator for the appellant. The Board rejected this statement. It was offered to the Board for the purpose of impeaching Meisner.

Examination of the statements reflect that they were somewhat stronger in tenor than the testimony of the witness. The phraseology contained in the statements, however, was employed by the appellant in the submission of the hypothetical question to her expert witnesses—Dr. McCumber and Dr. Crismon. It is to be noted that had the exhibits been admitted for the declared purpose of impeaching appellant's own witnesses (I.C. § 9–1207) the only effect would have been to affect their credibility. Any contradiction in the statements could not have been considered as establishing the truth of the statements contained in the exhibit, but the exhibits could have been considered only as tending to affect the credibility of appellant's own witnesses. Bodenhamer v. Pacific Fruit & Produce Co., 50 Idaho 248, 295 P. 243 (1931). No prejudicial error appears in exclusion of these two exhibits, even though the Board did not allow another exhibit of the same type to be introduced into evidence during the course of examination of another of appellant's witnesses.

Appellant points out that the Board in its ultimate findings and rulings of law held that she failed to prove by a preponderance of the evidence "that with medical certainty or with any degree of medical probability he [Davis] had at the time of his death a pre-existing coronary disease." She asserts that respondents in their answer admitted that Davis was suffering from a pre-existing heart condition, alleging therein that the death of Mr. Davis resulted from such condition which in no way arose out of and in the course of his employment. In the hypothetical questions presented to the respective expert witnesses, the facts concerning the asserted pre-existing heart condition, its relationship to Mr. Davis' employment, and the causal connection between such condition, his employment and death, were all presented. The expert witnesses accepting appellant's theory on these issues did not establish, in the opinion of the Board, the causal connection of any such pre-existing condition and the employment; any error in this regard would not be prejudicial to the ultimate holding of the Board denying benefits.

There appearing to be no basis for reversal of this case, the order of the Industrial Accident Board is affirmed. No costs allowed.

SMITH, C. J., and TAYLOR, McQUADE and SPEAR, JJ., concur.