456 P.2d 751

**Dick L. JOHNSON, Claimant-Respondent,**

v.

**BOISE CASCADE CORPORATION, and
Workmen's Compensation Exchange,
Defendants-Appellants.**

**No. 10372.**

Supreme Court of Idaho.

July 8, 1969.

Blake, Feeney & Mosman, Lewiston, for defendants-appellants.

Coughlan, Imhoff, Christensen & Lynch, Boise, for claimant-respondent.

SPEAR, Justice.

On August 18, 1964, respondent was employed by Boise Cascade Corporation, one of the appellants herein, at Emmett, Idaho. While stacking lumber, the respondent twisted his back, experiencing immediate pain. The next day respondent visited Wm. B. Jewell, M.D., of Emmett, who prescribed conservative treatment and referred respondent to Jerome K. Burton, M. D., an orthopedic surgeon practicing in Boise, Idaho. Dr. Burton determined that respondent had suffered an upper back sprain and referred him back to Dr. Jewell for further conservative treatment. Thereafter respondent made reasonable progress until January 17, 1965, at which time he had a recurrence of the back pain and was hospitalized. He was put in traction and was referred to Edward Kiefer, M.D., a neurosurgeon of Boise, for consultation. On February 2, 1965 a notice of injury and claim for compensation was filed with the Industrial Accident Board.

Dr. Kiefer examined the respondent and made a report of his findings on February 15, 1965. At that time it was the doctor's impression that respondent had a possible lumbar disc protrusion at the L4–5 level. Dr. Kiefer recommended a myelogram. The myelogram verified the doctor's impression and on February 22, 1965, the respondent was subjected to a lumbar laminectomy and a disc protrusion at the L4–5 interspace was removed.

Thereafter the respondent made an excellent post-operative recovery and by letter under date of June 24, 1965 Dr. Kiefer

expressed the opinion that the patient was reemployable, as surgically healed, with a ten per cent permanent partial disability as compared with the loss of one leg at the hip.

On July 6, 1965, respondent and the appellant entered into a compensation agreement which was approved by the Industrial Accident Board on July 16, 1965. An award of specific indemnity was made to the claimant for partial permanent disability equivalent to ten per cent of the loss of a leg at the hip, which amounted to 18 weeks at $30 per week for a total of $540.00.

Respondent returned to work for Boise Cascade Corporation on June 28, 1965. About August 31, 1965 respondent had a recurrence of the back pain, together with pain radiating down the back of his legs. Since Dr. Kiefer was not available respondent was examined by Gordon Daines, M. D., orthopedic surgeon of Boise. Dr. Daines could find no evidence of a recurrence of respondent's disc problem and felt his discomfort was a secondary effect of the previous surgery. X-rays revealed a considerable amount of pantopaque dye scattered throughout the spinal area, apparently as a result of the myelogram performed on respondent prior to surgery on February 22, 1965. Dr. Daines prescribed a support garment and other conservative treatment. The conservative treatment was not successful. Consequently Dr. Kiefer performed a second lumbar laminectomy on January 6, 1966. Disc protrusions were discovered at the L4–5 level and the L5–S1.

The respondent did well, post-operatively, and it was recommended that he return to work, provided he did not do any lifting or back straining. Respondent returned to work on April 11, 1966, and on July 18, 1966, Dr. Kiefer fixed respondent's residual disability as being twenty per cent as compared to the loss of one leg at the hip.

On August 8, 1966 respondent and the appellants entered into a second compensation agreement which was approved by the Board on January 11, 1967. The agreement provided that the claimant would be paid total temporary disability compensation from December 30, 1965 to April 11, 1966 and further provided for partial permanent specific indemnity equivalent to twenty per cent as compared to the loss of a leg at the hip, or 36 weeks at $30 per week. Half of the partial permanent indemnity compensation was deemed paid by payments made pursuant to the compensation agreement approved July 16, 1965.

On December 27, 1967 respondent again slipped while attempting to get into a pick-up truck. When he slipped he grabbed for the steering wheel to keep from falling, and experienced immediate pain in the low back. This particular incident had nothing to do with any employment of respondent for it was an off-of-the-job accident.

As a result of the "pick-up truck" accident, respondent again began experiencing some of the previous symptoms. He again visited Dr. Kiefer who opined that this recent incident had "aggravated [respondent's] past back pathology." Dr. Kiefer recommended hospitalization and myelography to ascertain whether there was recurrent nerve root lesion.

On January 9, 1968, a myelogram was performed, followed by surgery. On January 10, 1968 Dr. Kiefer reported as follows:

"Mr. Johnson * * * had a complete block at about the level of the fourth lumbar vertebra. There were strands of pantopaque noted above the block, which would tend to indicate the presence of arachnoiditis. * * *

"At the time of surgery there was extensive dural scarring, and great pains were taken to avoid any opening of the dura or into the subarachnoid space, because if arachnoiditis existed, this would or could conceivably greatly aggravate the problem. Therefore the dura was not opened; however, at the L–4–5 level after considerable difficulty because of extensive scarring, a lumbar disc was en-

countered and this was removed without complication. * * *

"I hope that by this procedure, the patient's symptoms will be adequately relieved; however, the problem of arachnoiditis still exists. If the patient's clinical response is such that his relief of pain is sufficient, there need be no further investigation as far as the arachnoiditis. I feel that to establish this diagnosis a biopsy would have to be obtained, and this could be injurious to the patient's eventual recovery."

Dr. Kiefer further discussed the problem of arachnoiditis in his letter of January 22, 1968:

"* * * the possibility of this patient having arachnoiditis cannot be excluded. The X-rays did appear that it could be that; however, as I explained at that time, making a positive diagnosis of arachnoiditis, would entail opening the dura, and eventually causing this patient to become worse as far as this possibility is concerned. For this reason, only the extra-dural area was explored. * * *"

At the hearing before the Board Dr. Kiefer testified that the arachnoiditis could be either traumatic or chemical in origin. That is, it could be the result of respondent's successive injuries or it could be the result of the successive myelograms which were performed on him. Dr. Kiefer also testified as to the nature of arachnoiditis:

"Q And what is the end result with respect to arachnoiditis? Does it improve, get worse, or stay stationary?

"A Generally speaking arachnoiditis remains, we hope, hopefully stationary. I have seen progressive arachnoiditis and this is not the case in question, because usually if arachnoiditis spreads, it spreads rapidly, and it's a matter of weeks or a few months and there's a progression of the symptoms. I've seen, if it occurs up in the neck, for example, where it causes a respiratory paralysis and eventual death. * * *

* * * * * *

"The feeling among those of us who do neurologic surgery, that if you expect arachnoiditis, don't operate on them. In other words, don't go in and try to take a little piece out to prove something. This is the point.

"Q And that was your reason for not taking a biopsy in this case?

"A That's correct.

* * * * * *

"Q Are Mr. Johnson's symptoms, which he complained to you about, compatible with these symptoms of arachnoiditis?

"A Yes, they are."

On cross-examination Dr. Kiefer testified further about arachnoiditis:

"Q Doctor, the way you would medically determine arachnoiditis or probable arachnoiditis would be by a biopsy, is that correct?

"A Yes, that's correct.

"Q And no biopsy was performed?

"A Absolutely not.

"Q There is merely conjecture that he is suffering from such a condition?

"A There is X-ray evidence that this does exist. However, as I stated before, being forewarned of the situation or even a potentiality of this sort of thing, the biopsy would be contraindicated.

"Q And it could be caused by chemical as well as by trauma?

"A That's correct."

In testifying before the Board Dr. Kiefer stated that he did not see the respondent between July 18, 1966 and January 8, 1968, thus raising the inference that respondent did not have any back trouble from the time of the second laminectomy until the "pick-up truck" incident. However, Dr. Kiefer did in fact see the respondent during that period, in particular, on June 27, 1967, the same date on which he filed a report with the Board. According to the report, at that time respondent advised the doctor that for the past two months he had been experiencing low back pain and left hip pain, radiating down the

left leg and ankle. According to respondent the pain was of a burning character.

After the surgery of January 11, 1968 Dr. Kiefer reported that the disc material removed was "mushy and degenerated in its appearance." This observation was substantiated by a pathologist's report, which stated:

"Sections revealed fibrocartilage undergoing marked fragmentation and show many areas of disintegration and degeneration."

Following a third laminectomy Dr. Kiefer reported on February 2, 1968, that the patient was going to have a protracted convalescence and the doctor recommended that respondent seek concentrated physical therapy. Dr. Kiefer further reported that respondent was having hip and leg pain but not to the extent that it existed prior to surgery. On April 18, 1968 Dr. Kiefer made another report, stating that the respondent was markedly improved and the doctor recommended that the claimant return to light work, apparently at the suggestion of the respondent himself.

Following the "pick-up truck" incident, respondent applied for and received non-occupational group accident and health benefits. In his application he stated that the disability did not arise out of and in the course of any employment.

By a report under date of August 2, 1968, the doctor advised that the respondent was having muscle spasms in the incisional area; that respondent's back movements were moderately restricted; and that lateral movements were almost at normal range. The doctor advised that because of respondent's tendency for disc herniations he should not indulge in his former occupation or do any heavy lifting or twisting. He then rated respondent's residual partial permanent disability as being equivalent to 35% of the loss of one leg at the hip. At the hearing the doctor testified that his latest rating of 35% was based solely on the respondent's present condition, and he refused to directly attribute the additional 15% to the "pick-up truck" incident. The doctor further stated flatly that he did not feel respondent was qualified to do any manual labor. The doctor was of the opinion that respondent was capable of employment of intellectual nature. However it appears that respondent has only an eighth grade education.

In testifying before the Board, respondent himself stated that he had not worked since his last operation in January of 1968. He testified that he could not stand for protracted periods of time without incurring a pain in both legs, shooting up to the hips. Associated with the pains is some type of muscle contraction which has a tendency to pull the respondent's body to the left. It is apparent that even such a simple task as raking the yard is a painful experience for respondent.

Based on the foregoing, the Board made the following ultimate findings of fact:

I

"* * * the Board finds that the condition of said disc material and continued complaints of claimant prior to said surgery [of January 11, 1968] show a direct causal connection with the industrial accident of August 18, 1964. [Earlier the Board stated that, in its experience, it knew that degeneration of intervertegral discs such as the pathologist reported in this case, rarely occurred over such a short period of time as was involved between the date of the pick-up accident and the date of respondent's latest operation. The inference being that this disc injury was not caused by the 'pick-up truck' incident, but at most, the 'pick-up truck' incident simply aggravated a pre-existing condition.]

II

"The Board finds that, by a reasonable medical probability, claimant is afflicted with arachnoiditis, although the same appeared to be stationary at the time of the hearing herein.

### III

"The Board finds that a change of condition has occurred with respect to the claimant since the execution of the compensation agreement of August 8, 1966, as approved by the Board on January 4, 1967, all of which changed condition is attributable to the accident of August 18, 1964.

### IV

"The Board further finds that, at the time of the hearing herein, although claimant was not totally and permanently disabled, nevertheless, based on all of the competent testimony and competent documentary evidence herein, and as a result of the industrial accident of August 18, 1964, he is burdened with a residual partial permanent disability of 60% as compared to the loss of one leg at the hip, notwithstanding that the direct medical testimony herein estimated such disability to be 35% as compared to the loss of one leg at the hip. Under the provisions of earlier awards by agreements approved by the Board, claimant has been compensated for 20% of the loss of a leg at the hip. * * * * "

The Board then awarded total temporary disability compensation from December 28, 1967 to August 2, 1968 at the rate of $52.00 per week aggregating $1,619.43. The Board further awarded specific indemnity for additional residual partial permanent disability over the amount previously awarded, to the extent of 40% of the loss of a leg at the hip. The award was for 40% of 180 weeks or 72 weeks beginning August 2, 1968 at the rate of $30 per week aggregating $2,160.00. The total award then was $3,779.43.

Appellant has assigned as error the Board's findings of fact I, II, III and IV as set forth above. Appellants have also assigned error with respect to the award made pursuant to the findings of fact. It is the appellants' contention that neither the findings of fact nor the award are based on *any* substantial, competent evidence. Appellants contend that the findings of fact and award are contrary to the evidence adduced at the hearing and are therefore contrary to the law.

The first of the appellants' two basic arguments in this case is that the Board erred in determining that the "pick-up truck" incident aggravated a pre-existing condition, rather than being the cause of the injury itself. It is the appellants' position that respondent's condition as it existed early in January of 1968 was "the direct result of the non-occupational accident of December 27, 1967." Appellants claim that respondent has failed to carry the burden of proof in establishing that the injury of December 27, 1967 can fairly be traced to respondent's employment. Furthermore, appellants argue that in order for an employer to be liable for an aggravation of a pre-existing weakened condition, the aggravation itself must occur as a result of an accident arising out of and in the course of a claimant's employment. For this latter proposition they cite Nistad v. Winton Lumber Co., 59 Idaho 533, 85 P.2d 236 (1938).

■■ Findings of fact by the Industrial Accident Board will be sustained if supported by substantial, competent evidence. Fountain v. T. Y. & Jim Hom, 92 Idaho 928, 453 P.2d 577 (1969); Idaho Const. Art. 5, sec. 9; I.C. § 72–609; Bennett v. Bunker Hill Company, 88 Idaho 300, 399 P.2d 270 (1965); Duerock v. Acarregui, 87 Idaho 24, 390 P.2d 55 (1964); McBride v. J. R. Simplot Company, 92 Idaho 274, 441 P.2d 723 (1968); Davis v. Schmidt Brothers, Inc., 92 Idaho 312, 442 P.2d 448 (1968). The facts in this case, as set forth supra, clearly show that the respondent has had a long history of continuing back trouble. In particular it is apparent from Dr. Kiefer's report of June 27, 1967 and from the pathologist's report after the surgery of January 11, 1968, that the "pick-up truck" accident was not an overriding trauma which superseded respondent's previous history. Not only do we believe that the facts in this case support the Board's conclusion that the "pick-up truck" incident

aggravated a pre-existing condition, but we believe that a contrary conclusion on the part of the Board would have been unreasonable.

Nistad v. Winton Lumber Co., supra, has no bearing on whether an aggravating injury must occur during employment. In *Nistad* there was testimony that on May 3, 1937, the decedent complained of straining himself and "tasting blood" while at work. Subsequently, on June 1, 1937, Nistad was found unconscious on the job and died shortly thereafter. On the basis of the evidence, the Board concluded that the cause of death was "unknown," and consequently death must have been caused by disease. On appeal, the case was reversed and remanded back to the Board for the latter to make definite findings on the cause of death. In so ordering, this court said:

> "* * * the finding [of the Board] is contradictory and confusing * * *. *It must be kept in mind that aggravation or acceleration of a pre-existing disease or weakened condition, if caused by accident, results in industrial injury or death.* (emphasis added)
>
> * * * * * *
>
> "* * * it is not necessary that the *exact* cause of death be proven. The law does not require such a high degree of proof. It is sufficient to prove the *probable* cause."

The main thrust of the *Nistad* opinion is that on-the-job aggravation of a non-occupational disease or weakened condition, is compensable under the Workmen's Compensation Law.

■ The Industrial Accident Board found that respondent underwent a change of condition. Were we to adopt appellants' construction of the *Nistad* case, we would effectively eliminate I.C. § 72–607 from the Idaho law, because appellants are in effect contending that there can be no modification of an award on the basis of a change in condition unless the claimant is gainfully employed at the time he undergoes his change in condition. With this construction we disagree.

Appellants' second argument is that the Board erred in disregarding the only expert testimony with regard to disability. Dr. Kiefer was the only one who testified as to the respondent's disability and Dr. Kiefer's rating was 35%. The Board found that the disability was in fact 60% and made its award on the basis thereof. The Board cited Walker v. Hogue, 67 Idaho 484, 185 P.2d 708 (1947), as its authority for rating the respondent at a 60% disability. However, *Walker* dealt with the Board's authority in dealing with *causative factors*, and the court said the Board could use both medical and non-medical evidence to determine the cause of a disability. Here, we are concerned with the *degree* of disability, and, if appellants' contention be correct, the fact that there was *no* evidence by a doctor that respondent was 60% disabled. We have repeatedly held that findings as to cause, extent and origin of disability must be supported by at least *some* professional proof. Clark v. Brennan Const. Co., 84 Idaho 384, 372 P.2d 761 (1962); Comish v. J. R. Simplot Fertilizer Co., 86 Idaho 79, 383 P.2d 333 (1963); Stockdale v. Sunshine Mining Co., 84 Idaho 506, 373 P.2d 935 (1962); Laird v. State Highway Dept., 80 Idaho 12, 323 P.2d 1079 (1958).

Contrary to appellants' contention, however, there is professional evidence in this case rating respondent's disability at 60%. The evidence comprises "Claimant's Exhibit # 9." The exhibit in question is a rating of the respondent by the Rating Board of the Veterans Administration. The transcript of proceedings before the Industrial Accident Board reveals that the exhibit was authenticated by the Chairman of the Rating Board and was offered in evidence. The introduction of the exhibit in evidence was initially objected to by Mr. Blake, attorney for appellants, but the objection was later waived when it appeared that respondent's attorney would seek a continuance of the proceedings in order to obtain the testimony of Dr. Bovenmyer if Mr. Blake

persisted in his objection. Apparently respondent had intended to call Dr. Bovenmyer to testify as to the rating of respondent's disability, but Dr. Bovenmyer had unexpectedly taken sick. Dr. Bovenmyer was the physician on the Rating Board of the Veterans Administration.

The report in question was an official report of the Veterans Administration. As such, an objection on the basis of hearsay was not sustainable. See I.C. § 9–318. To the extent that Dr. Bovenmyer concurred in the conclusion of the report that respondent was 60% disabled, he rendered a professional opinion. As the record of a professional opinion, the report was competent evidence upon which the Industrial Accident Board could base a finding of 60% disability. Appellants were entitled to cross-examine the doctor for impeachment purposes, but their waiver of objection to the report constituted a waiver of the right of cross-examination.

Order affirmed. Costs to respondent.

McFADDEN, C. J., and McQUADE, DONALDSON and SHEPARD, JJ., concur.