# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 52032

|  |  |  |
|---|---|---|
| CHRISTOPHER MIKLOS, | ) | |
| | ) | |
| Claimant-Appellant, | ) | |
| | ) | Boise, November 2024 Term |
| v. | ) | |
| | ) | Opinion Filed: January 6, 2026 |
| L&W SUPPLY CORPORATION, Employer; | ) | |
| and INDEMNITY INSURANCE CO. OF | ) | Melanie Gagnepain, Clerk |
| NORTH AMERICA, Surety, | ) | |
| | ) | |
| Defendants-Respondents. | ) | |

Appeal from the Idaho Industrial Commission.

The decision of the Industrial Commission is <u>reversed</u>, and the case is <u>remanded</u>.

Mossman Law Office, LLP, Boise, for Appellant, Christopher Miklos. Taylor L. Mossman-Fletcher argued.

Gamel Law, PLLC, Garden City, for Respondent, L&W Supply Corporation and Indemnity Insurance Co. of North America. Nathan T. Gamel argued.

_____

MEYER, Justice.

This appeal from the Idaho Industrial Commission (Commission) involves a workers' compensation dispute stemming from injuries Christopher Miklos sustained while performing his duties as a drywall delivery employee for L&W Supply Corporation. Miklos injured his right ankle on October 28, 2019, in an incident that the employer and its insurer, Indemnity Insurance Company of North America, initially accepted as a compensable injury. Despite receiving benefits for medical care and temporary disabilities, disputes later arose following an independent medical examination (IME) in January 2021, which concluded that Miklos had reached maximum medical improvement. Consequently, the Surety discontinued benefits. Miklos contested the discontinuation, claiming that he was experiencing ongoing pain and asserting the need for additional medical treatment, including surgery. Subsequent imaging, delayed by nearly 18 months due to coverage denials and procedural disputes, revealed a recurrent tendon tear.

1

The Commission denied Miklos' claim after concluding that he failed to prove that his recurrent tendon tear was caused by the 2019 industrial accident. We vacate the Commission's decision because the Commission applied an incorrect legal standard to determine that Miklos was not entitled to continued compensation.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

While working as a drywall delivery employee for L&W Supply Corporation on October 28, 2019, Miklos twisted his right ankle. He was carrying drywall sheets up a stairway on a construction site. Indemnity Insurance Company of North America (the Surety) insured L&W Supply (collectively, the Respondents). The Respondents accepted Miklos' claim for workers' compensation benefits. The Surety paid for Miklos' medical care, temporary total disability (TTD), and temporary partial disability (TPD) benefits until January 22, 2021, the date Dr. George Nanos concluded that Miklos had achieved maximum medical improvement with a three percent whole-person impairment. After the Surety stopped payments, Miklos filed a workers' compensation complaint asserting ongoing pain and the need for additional treatment.

Diagnostic x-rays of Miklos' foot and ankle, taken shortly after his injury, showed mild to moderate degenerative joint disease in his right ankle, but no acute fractures were present. Miklos attended physical therapy and received steroid injections; however, due to persistent pain, he was referred to a specialty clinic. On March 17, 2020, magnetic resonance imaging (MRI) showed a "[h]igh-grade, partial-thickness tearing of the peroneus brevis tendon extending from the level of the distal fibula to the peroneal tubercle. The tear extends over [a] course of approximately 4 cm." Miklos' treating physician, Dr. Devon Nixon, recommended surgery after conservative measures failed to relieve Miklos' pain. On May 28, 2020, Dr. Nixon performed "extensive right lower extremity surgery" to repair the torn tendons and additional procedures to address other ankle injuries.

Miklos' post-surgical recovery was slow, and while his pain improved, he continued to experience discomfort. Throughout his recovery, he attended physical therapy and continued to visit Dr. Nixon for regular post-surgical evaluations for the remainder of the year. Three weeks after surgery, Miklos rated his pain level as ten out of ten, which improved to four out of ten three months post-surgery. At three months post-surgery, Dr. Nixon cleared Miklos for light-duty work at a desk with frequent breaks, if allowed by his job.

Six months after surgery, Miklos reported improvement, though he noted that "some days are good and some days are bad." He continued to feel pain in the front and outer part of his ankle, near the space between his heel and ankle bones. Upon examination by Dr. Nixon, Miklos reported no pain with movement in the areas that were painful before surgery. Still, he exhibited "some vague areas of tenderness" along the front and side of his ankle. Although Dr. Nixon could not identify the source of the pain, he determined that Miklos' ankle was significantly more stable. Dr. Nixon planned to reassess Miklos' symptoms in two months with repeat imaging. Eight months after surgery, Dr. Nixon found Miklos' right ankle to be "slightly stiffer" than his left. At an appointment in December, Dr. Nixon administered a steroid injection into Miklos' right ankle joint to alleviate his ongoing pain and aid recovery.

In late January 2021, at the Surety's request, Miklos underwent an IME conducted by orthopedic surgeon Dr. George Nanos. After examining Miklos and reviewing his medical history and records, Dr. Nanos concluded that Miklos had achieved maximum medical improvement and assessed him with a three percent whole-person impairment. Immediately after the IME, the Surety stopped Miklos' benefit payments, paid him his impairment rating, and closed his workers' compensation claim.

Miklos saw Dr. Nixon again the following month and reported continued moderate pain. Dr. Nixon reasoned that since an injection administered at an appointment two months before provided significant pain relief, the source of Miklos' continued pain might not be related to his peroneal tendons but could be joint-related. Dr. Nixon recommended that Miklos undergo a magnetic resonance arthrogram (MRA)[1] to evaluate post-operative healing, considering that Miklos' surgical procedure involved microfracture[2] and débridement[3] along the flat bottom of the shinbone, which forms the top of the ankle joint. On February 15, 2021, Dr. Nixon ordered an MRA, but the Surety denied coverage based on Dr. Nanos' IME report, providing that Miklos had reached maximum medical improvement. Upon request from Miklos' attorney, Dr. Nixon

---

[1] "Magnetic resonance arthrography" is "imaging of a joint after injection of a contrast material, usually gadolinium." *Dorland's Illustrated Med. Dictionary* 155 (33d ed. 2020); *see also id.* (defining "arthrography" as "radiography of a joint after injection of opaque contrast material").

[2] A "microfracture" is "an arthroscopic procedure for the repair of articular cartilage defects: the damaged cartilage is débrided and small holes are made in the subchondral bone; the clot formed by bleeding through the holes forms the basis for cartilage regeneration." *Id.* at 1143.

[3] "Débridement" is "the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed." *Id.* at 467.

reviewed the IME report and disagreed with Dr. Nanos' opinion that there were "no objective findings to direct any further treatment." He reiterated that an MRA was necessary to assess the source of Miklos' continued pain.

Following the denial of coverage, Miklos filed a workers' compensation complaint with the Commission in late March 2021, asserting entitlement to continued medical treatment and disability benefits. During the preliminary phases of the process, Miklos, through his attorney, continued to pursue approval for an MRA. Based on Dr. Nixon's disagreements with the IME conducted by Dr. Nanos, Miklos requested the Surety to authorize the recommended MRA in May. Several requests for an update went unanswered. After extended efforts, the Surety eventually approved an MRA on April 27, 2022, but mistakenly approved it for the wrong foot. The parties dispute the circumstances that led to the remaining delay, with each side blaming the other. The Respondents also allege the medical facility was at fault.

The MRA was performed on August 4, 2022, nearly a year and a half after Dr. Nixon's original request. By then, Dr. Nixon had moved out of state, and Miklos came under the care of Dr. Ben Hirose, a surgeon specializing in foot and ankle orthopedics. The MRA identified a "recurrent tear of [Miklos'] peroneal tendon [and] mild ankle joint arthritis" in his right ankle. Dr. Hirose discussed the MRA results with Miklos on October 26, 2022. During this appointment, Miklos complained of "numbness on the foot that radiate[d] up his leg to his knee" and pain in the "lateral and anterior aspects of his right ankle and forefoot," which negatively impacted his daily life. Upon examination, Miklos was tender over the ankle joint and exhibited reduced mobility in that ankle. Dr. Hirose diagnosed him with a distal tibial spur and a peroneal tendon tear. Noting that Miklos could not live with the pain, Dr. Hirose recommended surgical inspection and re-repair of the peroneal tendon.

Dr. Nanos, who conducted the earlier IME, was asked to review the MRA and determine whether the MRA affected his previous opinions. The MRA report did not change Dr. Nanos' diagnoses, opinions, or recommendations. Thereafter, the Surety denied coverage of the recommended surgery.

## B. Procedural History

Miklos' attempts to secure approval for the MRA coincided with the following procedural history. In early May 2021, the Respondents submitted their answer to the Commission. They admitted the accident described in Miklos' complaint had occurred. The Respondents also asserted

that they already paid Miklos the benefits to which he was entitled, including permanent partial impairment, temporary total disability, and temporary partial disability. They contested whether Miklos was eligible for additional disability benefits and ongoing medical care.

On July 28, 2021, Miklos submitted a request for the Commission to schedule a hearing before a representative of the Commission. He requested the Commission schedule a single-day hearing after October to address seven issues concerning his medical conditions and benefits, including "[w]hether [Miklos'] conditions were caused by an accident arising out of and in the course and scope of employment as defined by Idaho Code [section] 72-102(17)[.]" Two additional issues concerned whether Miklos was entitled to additional TTD and medical benefits. Finally, he requested a telephone status conference to discuss the Respondents' delayed discovery responses. The Respondents opposed setting a hearing, arguing that it was premature. They also claimed that a status conference was unnecessary since discovery was ongoing and Miklos had not filed a motion to compel.

In response, the Commission Referee issued a letter to both parties explaining the challenges of scheduling a hearing and outlining his approach to calendaring, given the hectic workers' compensation dockets. The Respondents then filed an updated response, indicating that since total permanent disability was disputed, further investigation was needed regarding Miklos' prior low back and hand injuries, as relevant records had not yet been provided.

On September 13, 2021, the Referee held a status conference regarding Miklos' request for calendaring. It is unclear what occurred at that conference because it was not recorded. Miklos' counsel asserts that he informed the Commission that the MRA ordered by Dr. Nixon required immediate authorization from the Surety, which was a disputed issue that required a hearing under Idaho Code section 72-712. In addition, counsel for the Respondents indicated that Dr. Nanos had determined that Miklos reached maximum medical improvement as of January 22, 2021. Therefore, no MRA would be authorized, effectively closing his claim.

On the same day, the Referee denied Miklos' request for calendaring based on the earlier status conference. The Referee, however, stated that either party could file another request for calendaring to set a hearing once a medical opinion indicated that Miklos was at or nearing maximum medical improvement.

The Referee eventually held a bifurcated hearing on April 20, 2023, to address the issues of causation, temporary disability, and continued medical benefits. After the hearing, the parties

submitted post-hearing briefs and conducted a post-hearing deposition of Dr. Hirose. The following March, the Referee issued findings of fact, conclusions of law, and recommendation, which identified the following issues for resolution:

1. Whether the condition for which [Miklos] seeks benefits was caused by the industrial accident;

2. Whether [Miklos'] condition is due in whole or in part to a preexisting injury or condition;

3. Whether [Miklos'] condition is due in whole or in part to a subsequent injury or condition; and

4. Whether and to what extent [Miklos] is entitled to . . . [m]edical care; and . . . [t]emporary disability benefits, either partial or total.

The Referee deferred the issues of permanent partial impairment, disability in excess of impairment, and attorney fees after the parties reserved the issues. The Referee considered Miklos' testimony at the hearing, Dr. Hirose's post-hearing deposition, and the joint exhibits admitted at the hearing, which included Miklos' medical records from 2007 to 2022, the parties' discovery responses, and Miklos' 2023 deposition. However, the Referee relied on the opinions of Miklos' treating physician, Dr. Hirose, as the sole medical basis for determining Miklos' right to medical benefits. The Referee found that Dr. Nanos' opinions were convincingly rebutted by Dr. Hirose's deposition and carried no weight.

The Referee concluded that, considering the totality of the evidence, Miklos failed to prove by a preponderance of the evidence both that (1) the condition for which he seeks medical benefits was caused by his industrial accident, and (2) he was entitled to ongoing medical treatment, including surgery to his right ankle. All remaining issues were deemed moot. The Commission issued an order adopting the Referee's findings of fact and conclusions of law.

Miklos then filed a motion for reconsideration, asserting two primary arguments: (1) that the Referee failed to provide a timely hearing concerning an MRA authorization, violating his right to procedural due process and his rights under Idaho Code section 72-712; and (2) that the Referee misapplied the law by failing to apply the compensable consequences doctrine explained in *Sharp v. Thomas Brothers Plumbing*, 170 Idaho 343, 510 P.3d 1136 (2022).

The Commission denied the motion. Regarding the procedural issue, the Commission did not analyze Miklos' due process argument, stating that constitutional issues fall outside the Commission's jurisdiction. Instead, the Commission concluded that there was no procedural violation under Idaho Code section 72-712 because Miklos' requests for hearings did not

6

specifically seek a ruling on the disputed MRA authorization but encompassed broader workers' compensation issues.

The Commission addressed the causation issue, stating, "It is only after [Miklos] presents medical evidence showing a causal connection between the work accident and the subsequent injury that *Sharp* applies. The evidence did not demonstrate that connection here." The Commission distinguished *Sharp*, reasoning that *Sharp* "deals with the aggravation of a compensable injury, not the initial need to prove a causal connection." The Commission explained:

> To bridge the gap between Dr. Hirose's testimony and proving causation, the Referee or Commission would have been required to speculate that the weakness of [Miklos'] ankle, made susceptible by the work accident, was a causal component of the new acute injury identified by Dr. Hirose. It may be tempting to do so, but the Commission cannot fill in missing elements of [Miklos'] case with self-generated medical opinions. *See Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 759 (2013) (finder of fact may not use their own expertise to render unqualified medical opinions). [Miklos] is not entitled to any presumption that Sharp provides because the preliminary requisite showing of a causal connection has not been made.

> . . . Although *Sharp* disavowed tort concepts in workers' compensation, it did not eliminate [Miklos'] burden to provide medical testimony that supports a claim for compensation to a reasonable degree of medical probability. *See Langley v. State, Industrial Special Indemnity Fund*, 126 Idaho 781, 785, 890 P.2d 732,736 (1995). It is only after [Miklos] presents medical evidence showing a causal connection between the work accident and the subsequent injury that *Sharp* applies. The evidence did not demonstrate that connection here. Per the testimony of [Miklos'] physician, the second tear was the result of a new acute injury. Although the Commission's analysis may have in some way resembled a discussion of intervening cause in that it discussed the occurrence of events post-injury, the context is that of a new injury requiring a connection to [Miklos'] work. Not aggravation. The Commission reaffirms its reasoning in the March 4, 2024, Decision and Order.

(Internal record citations omitted.) The Commission concluded that Miklos "failed to prove the new tear found in the August 4, 2022, MRI [sic] was in any way the result of the work accident in 2019. Most importantly the tear was a new injury." After the Commission denied his motion for reconsideration, Miklos timely appealed to this Court.

## II.    STANDARDS OF REVIEW

When this Court reviews Commission decisions, we "exercise[] free review over questions of law." *Mazzone v. Tex. Roadhouse, Inc.*, 154 Idaho 750, 755, 302 P.3d 718, 723 (2013); *see also* I.C. § 72-732. Our review of the Commission's findings of fact is limited to "whether the

Commission's factual findings are supported by substantial and competent evidence. . . ." *Hiatt v. Health Care Idaho Credit Union*, 166 Idaho 286, 290, 458 P.3d 155, 159 (2020) (quoting *Harper v. Idaho Dep't of Labor*, 161 Idaho 114, 116, 384 P.3d 361, 363 (2016)). "Because the Commission is the fact finder, its conclusions on the credibility and weight of the evidence will not be disturbed on appeal unless they are clearly erroneous. This Court does not weigh the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Id.* (quoting *Ehrlich v. DelRay Maughan, M.D., P.L.L.C.*, 165 Idaho 80, 83, 438 P.3d 777, 780 (2019)).

This Court, however, is not bound by the Commission's conclusions of law. *Hernandez v. Triple Ell Transp., Inc.*, 145 Idaho 37, 39–40, 175 P.3d 199, 201–02 (2007). In other words, this Court must set aside the Commission's order if the Commission failed to apply the law to the evidence correctly. *Id.*

### III. ANALYSIS

Miklos asks this Court to review the Commission's orders that denied workers' compensation medical and income benefits for a recommended second ankle surgery, and that denied reconsideration. He asserts two claims of error. First, Miklos contends that the Commission failed to apply the compensable consequences doctrine to its findings, and once that doctrine is used, he is entitled to continued benefits. Second, Miklos argues that the Commission violated its statutory duty under Idaho Code section 72-712 to set a hearing on Miklos' request for medical treatment, and this error prejudiced his substantial right to continued benefits.

In the proceedings below, the parties reserved the issues of permanent partial impairment, disability in excess of impairment, and attorney fees, and they have not been raised for resolution on appeal. Accordingly, we do not address these issues and express no opinion as to their merits. However, in reviewing the Commission's findings and conclusions, we conclude that the Commission erred as a matter of law. Since Miklos' first claim of error is dispositive, we do not address Miklos' second claim.

**A. We reverse the Commission's decision and remand the case because the Commission applied an incorrect legal standard when it evaluated the connection between Miklos' concededly compensable 2019 tendon tear and his 2022 recurrent tendon tear.**

Under the Idaho Workers' Compensation Law (the Act), a claimant must first establish that an industrial accident caused a compensable injury. *See, e.g.*, *Jordan v. Walmart Assocs., Inc.*, 173 Idaho 115, 121, 539 P.3d 593, 599 (2023). That threshold is not in dispute here. The Respondents do not dispute that Miklos first injured his ankle while working for L&W Supply. The Surety

accepted Miklos' claim for workers' compensation benefits after his 2019 accident. The central dispute in this appeal is whether the Commission applied the correct causation standard for a later recurrent tendon tear alleged to be an aggravation or consequence of the accepted injury. We conclude that the Commission applied an incorrect legal standard because the Commission's analysis is inconsistent with the compensable consequences doctrine, discussed in *Sharp v. Thomas Brothers Plumbing*, 170 Idaho 343, 510 P.3d 1136 (2022).

Before we explain the error in the Commission's causation analysis, it is helpful to provide some background on Idaho workers' compensation law.

1. Background: Idaho Workers' Compensation Law.

The Act is currently set forth in title 72 of the Idaho Code. *See generally* I.C. §§ 72-101 to 72-1717. Under the Act, employers are required to provide for an injured employee's medical, surgical, or other necessary treatment "as may be reasonably required by the employee's physician or needed immediately after an injury . . . , and for a reasonable time thereafter." I.C. § 72-432(1). The medical treatment employers are required to provide includes "all steps taken in order to effect a cure of an injury[.]" *Dilulo v. Anderson & Wood Co.*, 143 Idaho 829, 831, 153 P.3d 1175, 1177 (2007) (quoting *Reese v. V-1 Oil Co.*, 141 Idaho 630, 634, 115 P.3d 721, 725 (2005)).

The legislature enacted the state's first workers' compensation laws over 100 years ago. Act of Mar. 16, 1917, ch. 81, 1917 Idaho Sess. Laws 253–94; *Roe v. Albertson's Inc.*, 141 Idaho 524, 527–28, 112 P.3d 812, 815–16 (2005). The remedial act is purely statutory and explicitly "remove[s] industrial accidents from the common law tort system." *Maravilla v. J.R. Simplot Co.*, 161 Idaho 455, 462, 387 P.3d 123, 130 (2016) (citations omitted). The Act generally limits injured workers' remedies to compensation benefits for work-related injuries. *Smith v. Excel Fabrication, LLC*, 172 Idaho 725, 729, 535 P.3d 1098, 1102 (2023); *see also* I.C. § 72-209(1) ("[T]he liability of the employer under this law shall be exclusive and in place of all other liability of the employer to the employee, his spouse, dependents, heirs, legal representatives or assigns."). This is called the "exclusive remedy rule." *Smith*, 172 Idaho at 729, 535 P.3d at 1102. The workers' compensation regime is often called the "grand bargain," reflecting the compromise made by employers and employees by engaging in the employment relationship. *See id.* (citation omitted).

In 1971, the legislature extensively amended the workers' compensation laws. Act. Of Mar. 16, 1971, ch. 124, 1971 Idaho Sess. Laws 422–85; *Hite v. Kulhenak Bldg. Contractor*, 96 Idaho 70, 71, 524 P.2d 531, 532 (1974). Despite these amendments, the Act's fundamental purpose

remained unchanged: to provide "sure and certain relief" for injured employees, their families, and dependents. *Tupper v. State Farm Ins.*, 131 Idaho 724, 730, 963 P.2d 1161, 1167 (1998) (citation omitted). In exchange for providing that "sure and certain relief," employers are not required to admit fault, and the cost for certain medical procedures is capped at predetermined amounts set by regulation. *Thompson v. Burley Inn, Inc.*, 173 Idaho 637, 648, 546 P.3d 649, 660 (2024) (first citing I.C. § 72-201; then citing IDAPA 17.01.01.803 (2022)).

Still, to receive compensation under the Act, including "any and all" income, medical benefits, and medical services as defined in Idaho Code section 72-102(6), a claimant must establish "that he suffered both (1) an industrial *accident* and (2) a compensable *injury* resulting from that accident." *Jordan*, 173 Idaho at 121, 539 P.3d at 599 (citing *Serrano v. Four Seasons Framing*, 157 Idaho 309, 317, 336 P.3d 242, 250 (2014)). An "accident" is "an unexpected, undesigned, and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be reasonably located as to time when and place where it occurred, causing an injury." *Id.* (quoting I.C. § 72-102(17)(b)). "A compensable injury is 'a personal injury caused by an accident *arising out of* and *in the course of* any employment covered . . . .'" *Id.* (quoting I.C. § 72-102(17)(a)). An injury is deemed to be *in the course of* employment if it occurs while the employee is performing job duties. *Id.* (citing *Dinius v. Loving Care & More, Inc.*, 133 Idaho 572, 575, 990 P.2d 738, 741 (1999)). An injury is deemed to *arise out of* employment when there is "a causal connection" between the work conditions and the injury claimed. *Id.* (quoting *Hamilton v. Alpha Servs., LLC*, 158 Idaho 683, 689, 351 P.3d 611, 617 (2015)). Causation must be proven with expert medical testimony. *Tenny v. Loomis Armored US, LLC*, 168 Idaho 870, 878, 489 P.3d 457, 465 (2021) (citation omitted). "'Medical testimony' includes both oral testimony from physicians and evidence from medical records or reports." *Id.* (citing *Jones v. Emmett Manor*, 134 Idaho 160, 164, 997 P.2d 621, 625 (2000)).

Finally, to remain true to the Act's remedial intent, it is well established that the Act should be interpreted liberally in favor of employees "to serve the humane purpose for which it was promulgated." *Wernecke v. St. Maries Joint Sch. Dist. No. 401*, 147 Idaho 277, 282, 207 P.3d 1008, 1013 (2009); *see also Reese*, 141 Idaho at 633, 115 P.3d at 724 (citing *Haldiman v. Am. Fine Foods*, 117 Idaho 955, 956–57, 793 P.2d 187, 188–89 (1990)) ("[The Act] is to be liberally construed in favor of the claimant in order to effect the object of the law and to promote justice."). A liberal interpretation of the Act "does not mean that the courts should endeavor by construction

to extend its provisions to persons not intended to be included by it[.]" *Haldiman*, 117 Idaho at 957, 793 P.2d at 189 (citation omitted). After all, workers' compensation "is not meant or intended to be life or health insurance; it is purely accident and occupational disease insurance." *Chadwick v. Multi-State Elec., LLC*, 159 Idaho 451, 457, 362 P.3d 526, 532 (2015) (quoting *Konvalinka v. Bonneville County*, 140 Idaho 477, 479, 95 P.3d 628, 630 (2004)). Instead, courts shall construe the Act "so far as is reasonably possible, [to] secure its benefits to all those who were intended to receive them." *Haldiman*, 117 Idaho at 956–57, 793 P.2d at 188–89 (citation omitted). All courts agree "that doubtful cases should be resolved in favor of compensation, and that the humane purposes which these acts seek to serve leave no room for narrow technical construction." *Id.* at 957–58, 793 P.2d at 189–90 (quoting *Smith v. Univ. of Idaho*, 67 Idaho 22, 26, 170 P.2d 404, 406 (1946)).

With this framework in mind, *Sharp* clarifies how causation should be analyzed when a claimant alleges that a later condition is an aggravation or consequence of a compensable injury.

### 2. The compensable consequences doctrine.

In *Sharp*, this Court addressed the extent to which employers are required to provide for an injured employee's reasonable medical, surgical, or other necessary treatment to cure that employee's injury. 170 Idaho at 353–57, 510 P.3d at 1146–50. In doing so, we engaged in a detailed discussion of the compensable consequences doctrine, citing Larson's Workers' Compensation Law, a leading treatise in the field. *Id.*; *see also* 1 Larson's Workers' Compensation Law §§ 10.01–10.12 (2024). The compensable consequences doctrine ensures that an aggravation of an injury initially sustained at work is also compensable, holding the employer responsible for ongoing benefits, even if the aggravation occurs outside of work or after the employer no longer employs the claimant. *See id.* at 357, 510 P.3d at 1150. This is so unless the employer can show the aggravation results from the claimant's "conduct that [was] undertaken with rash or deliberate disregard of a material risk that the harm will occur." *Id.*

The claimant in *Sharp*, a plumber, suffered a workplace back injury in 2015, which required surgery. *Id.* at 347, 510 P.3d at 1140. Post-surgery, the claimant had a significant weight gain of up to 120 pounds, despite repeated medical advice to lose weight to aid in recovery. *Id.* The claimant filed a workers' compensation complaint, asserting entitlement to additional medical benefits, total permanent disability benefits, and attorney fees. *Id.* at 347–48, 510 P.3d at 1140–41. At the hearing to determine the claimant's permanent disability rating in 2019, restrictions

from a later IME showed far more functional loss than earlier restrictions from 2016. *Id.* at 348, 510 P.3d at 1141. The Commission attributed the claimant's diminished functional ability to post-injury weight gain, which was treated as a superseding cause. *Id.* at 353, 510 P.3d at 1146. The Commission concluded that the claimant's weight gain broke the causal connection between his workplace injury and his worsened disability and, therefore, the employer was relieved of liability. *Id.* at 351, 510 P.3d at 1144.

On appeal, we vacated the Commission's decision and remanded the case for the Commission to conduct a new disability evaluation. *Id.* at 349–50, 510 P.3d at 1142–43. However, we also held that the Commission erred in its causation analysis. *Id.* at 350, 510 P.3d at 1143. We addressed the legal error to avoid repetition on remand since the Act did "not address whether, or in what circumstances, an employer is relieved of liability when a subsequent, non-work-connected cause aggravates a compensable injury . . . ." *Id.* at 352, 510 P.3d at 1145. Specifically, we rejected the Commission's rigid application of the tort-based superseding cause doctrine. *Id.* We explained that traditional tort concepts cannot be mechanically applied in workers' compensation cases because workers' compensation law operates under a no-fault system to allocate costs, rather than traditional tort concepts, which focus on assigning blame. *See id.* at 353, 510 P.3d at 1146.

Instead, borrowing from Larson's for its discussion of the compensable consequences doctrine, we held that (1) "the consequences flowing from a compensable injury are also compensable unless they result from an employee's conduct that is undertaken with rash or deliberate disregard of a material risk that the harm will occur[,]" (2) a heightened standard applies "before an employer is relieved of liability for the consequences flowing from a compensable injury[,]" and (3) "an employee's fault is relevant to the scope of compensable consequences[.]" *Id.* at 356–57, 510 P.3d at 1149–50.

The compensable consequences doctrine involves a two-part inquiry.

    a.   <u>First, the claimant must establish that the initial injury arises out of and in the course of employment.</u>

The inquiry begins with the claimant establishing that the initial injury arises out of and in the course of employment. *Id.* at 354, 510 P.3d at 1147. In *Sharp*, we explained that

> The basic test of employer liability is a causal connection between covered employment and a claimant's injury. Once this connection is established, our workers' compensation statutes do not distinguish between primary and secondary consequences, and to infer such a distinction would be inconsistent with the

mandate that the law be interpreted liberally to ensure full compensation for employees.

*Id.* at 354, 510 P.3d at 1147 (citing I.C. § 72-201). It is unnecessary for the cause of an aggravation of a compensable injury to arise out of employment for it to be compensable. *Id.* at 356, 510 P.3d at 1149. In *Sharp*, it was clear that the claimant's initial lower back injury and the additional disability attributable to its aggravation were causally connected to his industrial accident. *See id.* We reasoned that

> this [was] not a situation involving a right hand and a left leg. The only part of [the claimant's] body that has been injured is the L5-S1 level of his spine. Nor is this a situation involving a separate, subsequent injury. While [d]efendants have argued that [the claimant] exaggerated his symptoms, there has not been a contention—nor could there reasonably be one based on the record—that [the claimant's] symptoms flowing from his work accident ever resolved.

*Id.* at 355, 510 P.3d at 1148.

In this case, the parties do not dispute the first part of the compensable consequences doctrine. Generally, whether an injury arose out of and in the course of employment is a question of fact to be determined by the Commission. *Clark v. Shari's Mgmt. Corp.*, 155 Idaho 576, 579–80, 314 P.3d 631, 634–35 (2013) (citation omitted). The Respondents agree that Miklos suffered a compensable injury—a peroneus brevis tendon tear. His compensable injury was caused by an accident that arose out of and in the course of employment when he twisted his ankle while performing his job duties—specifically, delivering sheetrock for L&W Supply on October 28, 2019. The Surety accepted liability for Miklos' 2019 ankle injury. The Referee acknowledged the undisputed fact in further findings of fact: "[B]oth parties agree [Miklos] first hurt his ankle delivering sheetrock."

Miklos argues that causation is established because the initial injury is "a factor" in the aggravation or secondary injury for which temporary or permanent benefits are claimed. However, this argument conflates the causation standard used to determine workers' compensation eligibility with the standard used to evaluate the cause of a claimant's permanent disability rating. *See* I.C. §§ 72-425, -430. The degree of Miklos' permanent partial impairment and disability in excess of impairment are not at issue in this appeal.

We also disagree with Miklos' argument that the Respondents concede the causal connection issue because they accepted and paid for Miklos' initial workers' compensation claim. His contention that he was not required to prove causation altogether is inconsistent with *Sharp*.

*See* 170 Idaho at 354, 510 P.3d at 1147; *see also Gomez v. Dura Mark, Inc.*, 152 Idaho 597, 603–04, 272 P.3d 569, 575–76 (2012) (Idaho Code Section 72-432(1) does not presume causation after an employer or surety commences payment for a claimant's medical care).

Once the claimant establishes part one of the compensable consequences doctrine, the second part addresses the extent to which employer liability extends. *See Sharp*, 170 Idaho at 356–57, 510 P.3d at 1149–50.

> b. <u>Second, the employer must establish that the employee's conduct was undertaken with rash or deliberate disregard of a material risk that harm would occur to absolve itself of liability.</u>

In *Sharp*, we clarified that "whether a secondary injury is a 'probable consequence' of an initial injury—in other words, a foreseeable consequence—is irrelevant. What matters is whether there is a demonstrable causal connection between the compensation sought and the work-connected injury." 170 Idaho at 355, 510 P.3d at 1148. Although we declined to adopt the complicated analysis described in Larson's treatise, we agreed with Larson's that a claimant's fault is only material when determining the scope of compensable consequences. *Id.* at 356, 510 P.3d at 1149. Our agreement was influenced by the long-standing principle of providing "sure and certain relief" to injured employees. *Id.* We explained that

> a "heightened negligence standard" must apply before an employer is relieved of liability for the consequences flowing from a compensable injury. Occasional lapses in judgment are a fact of the human condition. If, by happenstance, a lapse worsens a compensable injury or combines with a compensable injury to bring about new harm, cutting off employer liability would fail to ensure the "sure and certain relief" that the workers' compensation law is meant to provide.

*Id.* at 357, 510 P.3d at 1150. On remand, the Commission was tasked with resolving whether the claimant's conduct leading to his weight gain was undertaken with a rash or deliberate disregard of the risk sufficient to absolve his employer of liability. *See id.* at 358, 510 P.3d at 1151.

We did not establish in *Sharp* that a presumption of compensability exists after a workers' compensation claimant proves that his initial injury arises out of and in the course of employment. However, in our discussion of the compensable consequences doctrine, our first subheading stated, "The consequences of compensable injuries are presumptively compensable." *Id.* at 354, 510 P.3d at 1147. Our decision instead explained that, once a claimant has established a "demonstrable causal connection" between the initial compensable injury and the aggravation or secondary injury, treating that later harm as compensable follows from the purpose of the Act.

14

We did not explain the confines of "demonstrable causal connection" in *Sharp* because there was no dispute in that case regarding causation. *Id.* at 355, 510 P.3d at 1148. Both parties agreed that the claimant's increased back pain was an aggravation of a compensable injury—the initial spinal injury. *Id.*

Earlier decisions by this Court illustrate the confines of "demonstrable causal connection." *See, e.g.*, *Johnson v. Boise Cascade Corp.*, 93 Idaho 107, 456 P.2d 751 (1969); *Monroe v. Chuck & Del's, Inc.*, 123 Idaho 627, 851 P.2d 341 (1993). In *Johnson*, the claimant suffered a back injury while on the job that resulted in significant back pain and required surgical intervention. 93 Idaho at 107–08, 456 P.2d at 751–52. After undergoing surgery, the claimant continued to experience periodic pain and mobility issues. *Id.* Several years later, while engaging in an off-the-job activity, the claimant slipped while attempting to climb into a pickup truck. *Id.* The slip exacerbated his back condition, requiring additional treatment. *Id.* The employer argued that the off-the-job incident severed the connection between the claimant's ongoing condition and the initial work injury. *Id.* at 111, 456 P.2d at 755. The Industrial Accident Board, the Commission's predecessor, disagreed, finding that the weakened state of the claimant's back due to the work injury substantially contributed to his ongoing disability. *Id.* at 110–11, 456 P.2d at 754–55. This Court affirmed the decision that the subsequent injury was compensable. *Id.* at 112–13, 456 P.2d at 756–57. We reasoned that the claimant's slip aggravated the initial work-related injury, and it would be unreasonable to conclude the claimant's slip overrode his "long history of continuing back trouble." *Id.* at 111–12, 456 P.2d at 755–56.

By contrast, in *Monroe*, the claimant was asymptomatic following surgery for a back injury, then experienced a new injury at the same disc level two years later. 123 Idaho at 630, 851 P.2d at 344. This Court affirmed the Commission's finding that the claimant's later injury was not causally related to the initial injury, based on substantial and competent evidence that the claimant was asymptomatic in the interim. *See id.* *Johnson* and *Monroe* exemplify that when a claimant's symptoms persist after an industrial injury and later worsening involves the same anatomical area, an aggravation can fall within the compensable consequences doctrine. *See id.*; *Johnson*, 93 Idaho at 111–12, 456 P.2d at 755–56; *see also Anderson v. Harper's Inc.*, 143 Idaho 193, 196–97, 141 P.3d 1062, 1065–66 (2006) (holding hand tremors developed after cervical fusion surgery for a compensable back injury were compensable consequences of the industrial accident). We briefly mentioned this principle in *Sharp*, stating that "there has not been a contention—nor could there

reasonably be one based on the record—that [the claimant's] symptoms flowing from his work accident ever resolved." 170 Idaho at 355, 510 P.3d at 1148. Stated another way, based on the record in *Sharp*, it was clear that the claimant's increased back pain was an aggravation of his initial compensable injury because, after the initial injury, the claimant's symptoms never resolved.

Viewed against this legal backdrop, we turn to the merits of the parties' arguments on appeal.

3. <u>The Commission erred as a matter of law.</u>

Miklos' overarching position is that his recurrent tendon tear is a subsequent injury or aggravation resulting from the initial 2019 compensable ankle injury. He contends that the surgery performed to repair the torn tendon structurally weakened his ankle and that this vulnerability led to the recurrent tendon tear. The Respondent's position is that *Sharp* and the compensable consequences doctrine are inapposite to this case. They maintain that Miklos' recurrent tendon tear was a new and distinct injury caused by a subsequent activity or blow to his ankle, which occurred after his surgery, and after L&W Supply no longer employed Miklos.

Convinced by the Respondents' arguments, the Commission denied Miklos' claim. The Commission concluded that Miklos' recurrent tendon tear was not causally related to his industrial accident because Miklos failed to "prove by a preponderance of the evidence that his 2019 industrial accident caused the medical condition for which benefits were sought—specifically a second right ankle tendon injury diagnosed in 2022." The Commission reasoned that *Sharp* was inapplicable because "*Sharp* deals with the aggravation of a compensable injury, not the initial need to prove a causal connection."

The Commission erred in two main respects. First, the Commission erred in determining that *Sharp* and the compensable consequences doctrine were inapplicable to this case. This is a case involving an aggravation of a compensable injury. Despite the parties' dispute, the medical evidence supports a demonstrable causal connection between Miklos' 2019 work-related tendon tear and his 2022 recurrent tendon tear.

Shortly after his industrial accident, Miklos was referred to a specialist due to persistent pain. An MRI showed a "[h]igh-grade, partial-thickness tearing of the peroneus brevis tendon extending from the level of the distal fibula to the peroneal tubercle. The tear extends over [a] course of approximately 4 cm." Conservative measures, such as physical therapy, steroid injections, and several different foot casts, failed to resolve Miklos' pain. Miklos' treating

16

physician, Dr. Nixon, then performed "extensive" surgery. Following surgery, Dr. Nixon's medical records show that Miklos' post-surgical recovery was slow. Miklos' pain improved, but did not resolve. Three weeks after surgery, Miklos rated his pain level as ten out of ten, which, three months post-surgery, improved to four out of ten. Six months after surgery, Miklos reported some improvement, though he noted that "some days are good and some days are bad." Miklos continued to experience pain in the front and outer part of his ankle, near the small space between his heel and the ankle bone. Upon examination by Dr. Nixon, Miklos reported no pain with movement in the areas that were painful before surgery. Still, he exhibited "some vague areas of tenderness" along the front and side of his ankle. Although Dr. Nixon could not identify the source of the pain, he determined that Miklos' ankle was significantly more stable. Dr. Nixon planned to reassess Miklos' symptoms in two months with repeat imaging. Eight months after surgery, Dr. Nixon found Miklos' right ankle to be "slightly stiffer" than his left. At this appointment in December 2020, Dr. Nixon administered an injection into Miklos' right ankle joint to alleviate his ongoing pain and aid recovery.

Notably, Dr. Nixon recommended a second MRI in February 2021 due to Miklos' continued pain. At that time, Miklos had not worked for L&W Supply or any other employer since March 2020. When Miklos finally obtained an MRA in August 2022, it evidenced a recurrent tear of Miklos' peroneal tendon in his right ankle. The recurrent tear occurred in the exact anatomical location where the original tear was and where Dr. Nixon performed the surgery, though the recurrent tear was now "bigger" than the original tear.

Miklos' ongoing pain resembles the continuity of the claimant's "long history of continuing back trouble" in *Johnson*. 93 Idaho 111–12, 456 P.2d at 755–56. Miklos consistently reported varying degrees of pain and symptoms after surgery, as documented in Dr. Nixon's medical reports. For instance, in December 2020, Dr. Nixon administered a steroid injection into Miklos' right ankle joint to help alleviate his ongoing pain and aid his recovery. In February 2021, Miklos reported moderate pain and soreness in various areas, both inside and outside his ankle. Dr. Nixon speculated that since the injection from the previous appointment provided significant pain relief, the source of Miklos' pain might not be related to his peroneal brevis tendons but could be joint-related. By April 2021, Dr. Nixon concluded that further treatment was necessary, given that Miklos was nearly a year post-surgery and still experiencing pain. Dr. Nixon's notes indicate that the gap in medical records between early 2021 and October 2022 resulted from the

17

Respondent's discontinuing coverage for Miklos' medical treatment rather than suggesting any relief in his pain:

> I recently saw the patient in clinic. I want to get an [MRA]. This is a work comp injury. That [MRA] was denied by his work comp team. He states that he is at maximum medical improvement for an independent medical evaluation on 01/22/2021. His case has been closed. *Unfortunately, this means that I likely do not have anything further to be able to offer the patient* unless he wants to continue to see me through a private insurance.

(Emphasis added.)

Dr. Hirose's testimony also suggested the initial work injury never actually resolved: "The fact that [Miklos] still hurts in this same area where he had peroneal tendon surgery, coupled with the fact that the tendon appears to be torn on the new MRI [sic] scan, suggests that this is an ongoing problem that's causing him pain."

Further, Dr. Hirose's testimony acknowledged that individuals with a history of tendon surgery remain vulnerable to re-tear:

> [Miklos' Attorney:] What is, if you will, the success rate or the risk of reinjury for the surgery that Dr. Nixon performed?
>
> [Dr. Hirose]: That's not a simple answer. Usually the success rate is quite good, good to excellent, but the outcome depends on several factors. One of them is if the tendons have a lot of inherent disease in them to begin with. Because a normal tendon doesn't tear just on its own. Usually it has preexisting disease in it before it tears.
>
> The second component of that is more of a mental component, in terms of if a patient is going to get better. If they want to get better, that goes a long way with actually improving. And if they don't want to get better or if they have a lot of other issues in their life, for example, a lot of mental stress from one reason or another, sometimes they don't get better as fast as we would like them to.
>
> [Miklos' Attorney:] I see. Is the risk for re-tear always going to be there after surgery, given those factors that you just stated?
>
> [Dr. Hirose]: Yes.

The rest of Dr. Hirose's opinion wavered, alternating between attributing the tear to the initial injury and suggesting unrelated post-surgical causes. On Miklos' motion for rehearing, the Commission described the inconsistencies in Dr. Hirose's testimony:

> Dr. Hirose's deposition testimony is confusing at best. When one sentence or another is viewed in isolation, as both parties have done, he seems to support both the position that [Miklos'] current condition relates back to his original industrial injury, but also that his current condition is the result of one or more subsequent injuries which occurred after his surgery with Dr. Nixon.

18

The combined evidence from objective imaging studies, along with Dr. Nixon's clinical findings and Dr. Hirose's testimony, shows continuous pain symptoms in the same ankle, involving the same anatomical location from the initial accident through the time of the recurrent tear. This demonstrates that Miklos' recurrent tendon tear was an aggravation of his initial compensable injury. Dr. Hirose's testimony, while "confusing at best," may inject some doubt as to whether the recurrent tear flowed from the original industrial injury, but "doubtful cases should be resolved in favor of compensation," *Haldiman v. Am. Fine Foods*, 117 Idaho 955, 957–58, 793 P.2d at 189–90 (quoting *Smith v. Univ. of Idaho*, 67 Idaho 22, 26, 170 P.2d 404, 406 (1946)). The Commission erred by determining that *Sharp* and the compensable consequences doctrine were inapplicable.

The Commission next erred in requiring Miklos to prove a negative—that no other potential cause existed. The Commission concluded that Miklos did not demonstrate the "essential precondition" of a causal connection. In arriving at that conclusion, the Commission implicitly placed a heightened standard of proof on Miklos to establish a causal connection in an aggravation of a compensable injury case:

> [Miklos] notes Dr. Hirose established that [Miklos] is more susceptible to reinjuring his ankle after his first injury and surgery, so it is not surprising that due to his first injury he now has retorn his tendon. While Dr. Hirose did opine that [Miklos] would be more susceptible to reinjuring his tendon after the first surgery, that fact is not the same thing as saying subsequent fraying of the tendon would be due to the first injury. Dr. Hirose made it clear in his deposition that the tendon would not begin fraying on its own accord. Instead, there must be some activity or external force to fray the tendon once repaired by Dr. Nixon. Whatever force was involved in causing the tear, it occurred after [Miklos] stopped working for [L & W Supply].
>
> . . . While it could be argued that [Miklos'] activities of daily living, including working full time, could constitute the "activity" needed to re-tear [Miklos'] tendon which was made more susceptible to reinjury after the initial injury, unfortunately for [Miklos] medical testimony for that argument is lacking in the record and would require assumptions and speculation. Dr. Hirose was not asked if such could be the case. The Referee would need to take it upon himself to fill in gaps in Dr. Hirose's deposition testimony to reach that conclusion. As discussed below, as inviting as that proposition is, it is not within the boundaries of permissible conduct.

At the same time, the Commission acknowledged that the parties did not identify a specific event that caused the recurrent tear and that the "how" of the re-injury remained a mystery. The Commission highlighted the lack of evidence, stating:

the issue for resolution centers on how and why that tear occurred. *The "how" remains a mystery, as no one has pointed to any singular particular event which would account for the tear.* Dr. Hirose specifically ruled out the possibility of a failed initial surgery. Instead, the parties are bound to the notion that Dr. Nixon properly repaired [Miklos'] peroneus tendons and left no frayed or fraying fibers. Therefore, *some unknown cause* which occurred post-surgery *must account for* [*Miklos'*] *MRI* [sic] *finding of a recurrent peroneus brevis tendon tear*.

(Emphasis added.) The Commission's statement that "[Miklos] must prove the recurrent tear is related in some way to the initial work injury of October 28, 2019[,]" in effect, placed the burden on Miklos to produce medical testimony that eliminated a speculative intervening event. Instead of shifting the burden, the Commission focused on Dr. Hirose's testimony that suggested Miklos' recurrent tendon tear could have resulted from activities he engaged in after his surgery and outside of his employment with L&W Supply: "Dr. Hirose testified that [since] anyone can get a recurrent tendon tear after corrective surgery . . . it was possible [Miklos] could have suffered the recurrent tear while working for any of his post-surgical employer."

The Commission's analysis is inconsistent with the second part of the compensable consequences doctrine explained in *Sharp*. Under the doctrine, once medical testimony provides a demonstrable causal connection between the compensable injury and the later aggravation or secondary injury, an employer is absolved from liability only after the *employer* establishes that the aggravation of a compensable injury, or a secondary injury, resulted from the employee's rash or deliberate disregard for a material risk that the harm will occur. *See Sharp*, 170 Idaho at 356–57, 510 P.3d at 1149–50. Contrary to the Respondent's argument—and the Commission's conclusion—a speculative post-employment activity or injury does not sever the causal connection. Like the off-the-job slip in *Johnson*, engaging in post-surgical employment activities, such as walking, driving, or standing, does not meet the heightened standard required to cut off the Respondents' liability. The Respondents and the Commission focused on Dr. Hirose's conclusion that a subsequent activity or blow to the ankle must have caused the recurrent tear and stopped there. The Respondents did not present evidence that Miklos' recurrent tendon tear resulted from his rash or deliberate disregard for a material risk that harm would occur.

In summary, the Commission erred in determining that there was not a demonstrable causal connection between Miklos' 2019 work-related tendon tear and his 2022 recurrent tendon tear. The Commission further erred by requiring Miklos to prove that the recurrent tear was not caused by a new injury to his ankle rather than by holding the Respondents to the burden of showing that

Miklos engaged in rash or deliberate disregard for the risk of harm that resulted in the recurrent tear. We reverse the Commission's decision and remand the case for further proceedings consistent with this opinion.

**B. Although we need not address Miklos' claim that the Commission breached its duty under Idaho Code section 72-712, we emphasize the Commission's duty under section 72-710.**

The second issue is whether the Commission violated its statutory duty under Idaho Code section 72-712 to set a hearing on Miklos' request for medical treatment, thereby prejudicing Miklos' substantial rights. Miklos argues that the Commission failed to fulfill its obligation under Idaho Code section 72-712, which requires the Commission to hold hearings to resolve workers' compensation benefits disputes. He points out that the nearly two-year delay between his request for a hearing in July 2021 and the actual hearing in April 2023 significantly prejudiced his rights. The Respondents contend that the delays were reasonable due to the complex nature of the case and the need to gather comprehensive medical records and expert opinions from both parties.

Given our decision regarding the dispositive issue above, we need not address Miklos' second claim of error further. However, in addition to procedural delays, the Commission failed to record several hearings. If we had reached Miklos' second claim of error, the failure to record the previously referenced hearings would likely have impaired our ability to analyze Miklos' argument.

In light of these circumstances, we take this opportunity to emphasize the importance of adhering to statutory requirements that safeguard the rights of workers' compensation claimants. Idaho Code section 72-710 requires that "[a] stenographic or machine transcription of any proceeding or of testimony adduced at any hearing, shall be taken by the [C]ommission." I.C. § 72-710. The Act also states that, in any appeal to this Court, the agency's record and the reporter's transcript must include all relevant portions and documents from the Commission's proceedings and be prepared, processed, and transmitted to the Supreme Court in accordance with the Supreme Court's rules. I.C. § 72-725. This requirement is consistent with our acknowledgment that "[t]his Court is, after all, a reviewing Court, and that review is confined to the record before us." *Groveland Water & Sewer, Dist. v. City of Blackfoot*, 169 Idaho 936, 941, 505 P.3d 722, 727 (2022) (citing *Taylor v. Taylor*, 163 Idaho 910, 920, 422 P.3d 1116, 1126 (2018)); *see also State v. Flint*, 114 Idaho 806, 809, 761 P.2d 1158, 1161 (1988) ("We are restricted to the record before us and may not consider matters outside the record." (citation omitted)). As

21

such, it is essential for this Court to have a complete appellate record when reviewing workers' compensation appeals. *See Groveland Water & Sewer, Dist.*, 169 Idaho at 941, 505 P.3d at 727; *see also Ayala v. Robert J. Meyers Farms, Inc.*, 165 Idaho 355, 361, 445 P.3d 164, 170 (2019) (explaining that "this Court must have a complete record" when "taking up" a workers' compensation appeal).

It is the appellant's burden to provide a sufficient record to support his claims on appeal. *Groveland Water & Sewer, Dist.*, 169 Idaho at 941, 505 P.3d at 727 (quoting *Med. Recovery Servs., LLC v. Eddins*, 169 Idaho 236, 241 n.1, 494 P.3d 784, 789 n.1 (2021)). Still, the appellant's ability to meet that burden is contingent on the Commission's duty to record the hearings, as outlined in Idaho Code section 72-710, which requires a transcription of proceedings or testimony.

We highlight this issue to emphasize the importance of adhering to the statutory requirement under Idaho Code section 72-710, thereby safeguarding the rights of workers' compensation claimants.

## C. We award Miklos attorney fees on appeal under Idaho Code section 72-804.

The final issue is whether either party is entitled to attorney fees on appeal. Miklos and the Respondents request attorney fees as the prevailing party on appeal. Based on our decision above, the Respondents are not the prevailing party on appeal. In addition, this Court has held that it has "no authority to award attorney fees against an unsuccessful worker's compensation claimant." *Sund v. Gambrel*, 127 Idaho 3, 8, 896 P.2d 329, 334 (1995) (citing *Swanson v. Kraft, Inc.*, 116 Idaho 315, 322, 775 P.2d 629, 636 (1989)).

Miklos contends that he is entitled to attorney fees under Idaho Code section 72-804 and Idaho Appellate Rule 41(a). Idaho Code section 72-804 is a remedial statute that authorizes awarding attorney fees under three circumstances. *McGivney v. Aerocet, Inc.*, 165 Idaho 227, 237, 443 P.3d 241, 251 (2019). An "employer shall pay reasonable attorney fees in addition to the compensation provided by this law" in three circumstances, including if the employer or the surety (1) "contested a claim for compensation made by an injured employee . . . without reasonable ground[s]," (2) "neglected or refused within a reasonable time after receipt of a written claim for compensation to pay to the injured employee or his dependents the compensation provided by law," or (3) "discontinued payment of compensation as provided by law justly due and owing to the employee or his dependents" without reasonable grounds. I.C. § 72-804.

Miklos argues that the surety discontinued and denied benefits without reasonable grounds, including the prolonged denial of the MRA and reliance on an IME that the Commission itself later deemed to carry no weight. The Respondents counter that their denial of benefits, including the MRA and subsequent surgery, was reasonable because of gaps in the medical evidence linking the recurrent injury to the initial industrial injury.

Contrary to the Respondents' assertion, rather than suggesting any progress in Miklos' recovery, Dr. Nixon's note from April 2021 indicates that the gap in medical records between early 2021 and October 2022 was caused by the Respondent's discontinuation of coverage for his medical treatment. The Respondents discontinued payment of compensation for an undisputed initial compensable injury. Their reasoning for doing so discounts an important point: Dr. Nixon recommended the MRA in February 2021 due to Miklos' continued pain. At that time, Miklos had not worked for any other employer except L&W Supply since March 2020. The Respondents' denial of benefits, including the delay in authorizing the MRA and then approving one for the wrong foot, was without reasonable grounds. We hold that this is the type of conduct contemplated by section 72-804.

Therefore, we award Miklos attorney fees on appeal under Idaho Code section 72-804 and Idaho Appellate Rule 41(a). Costs on appeal are awarded as a matter of course to Miklos as the prevailing party under Idaho Appellate Rule 40(a).

## IV. CONCLUSION

The Commission's decision is reversed, and the case is remanded for further proceedings consistent with this opinion. We award Miklos attorney fees and costs on appeal.

Chief Justice BEVAN and Justices BRODY and MOELLER CONCUR. Justice ZAHN CONCURS in the RESULT.